**UNITED STATES of America, Plaintiff,**

**v.**

**Michael ABBARNO and John Pelitieri, Defendants.**

**Cr. No. 1972–18.**

United States District Court,
W. D. New York.

May 12, 1972.

C. Donald O'Connor, Acting U. S. Atty., Buffalo, N. Y. (Philip B. Abramowitz, Buffalo, N. Y., of counsel, for the Government.

Mattar, Bork, Mattar & D'Agostino, Buffalo, N. Y. (Nathan A. Bork, Buffalo, N. Y., of counsel), for defendant Abbarno.

Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N. Y. (William H. Gardner, Buffalo, N. Y., of counsel), for defendant Pelitieri.

CURTIN, District Judge.

By motion to suppress, the defendants seek an order invalidating a search by Secret Service agents which resulted in the discovery of a printing press and other paraphernalia which the government charges were used by the defendants in a counterfeiting scheme.

The indictment contains four counts. The first charges that between September 1, 1971 and January 28, 1972 the defendants conspired to possess and conceal counterfeit notes. The second charges the defendants with making the counterfeit notes, and the third with possessing and concealing them. The fourth charges only John Pelitieri with transferring counterfeit obligations on January 3, 1972.

On January 28, 1972 when the agents searched a small room located on the second floor of a warehouse building at 1738 Elmwood Avenue, Buffalo, New York, they discovered the aforementioned printing press and other paraphernalia. The government justifies the search on the ground that it had a search warrant for the premises and also had received a consent to search this room from the owner of the building and from the tenant who had control of the room by virtue of a written lease.

After a hearing at which Secret Service agents, the landlord and the tenant testified, the parties had an opportunity to file briefs. The following constitutes the court's findings of fact and conclusions of law.

The principal contentions of the defendants are: First, that under the circumstances neither the landlord nor the tenant had the ability to give consent to the agents to search this room and, second, that the Magistrate improperly granted the search warrant.

The defendants have standing to move for suppression in this case. *See* Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); United States v. Sacco, 436 F.2d 780, 782 (2d Cir. 1971); Spinelli v. United States, 382 F.2d 871, 879 (8th Cir. 1967), rev'd on other grounds, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); and United States v. White, 268 F.Supp. 998 (D.D.C.1966).

In late August or early September, 1971, Michael Abbarno went to James DiChristopher, one of the owners of the warehouse at 1738 Elmwood Avenue, and asked him if he could store some vending machines on the premises. DiChristopher gave him permission to use the front part of the second floor at a rental of $100 a month, but told him that it was only a month-to-month arrangement and that, if a tenant wanted the area, he would have to move out. The room, marked "Ladies—First Aid," in which the printing press was eventually found was not part of the area originally set aside for Abbarno's use. Abbarno paid the nominal rental of $100 a month for two months. Near the end of October, DiChristopher told Abbarno that he and Peletieri would have to move out because the entire second floor was being rented. Abbarno told him that

they would move out in a few days. A few days later, one of the defendants called DiChristopher and told him that they had moved some of their equipment into the Ladies and First Aid room, but would move it in a couple of days. DiChristopher took no action to move them out. The defendants paid no further rent, but they did place a lock on the door. DiChristopher did not have a key to this lock.

In late September or early October, 1971, Mr. DiChristopher and his associates entered into an oral lease with ABC Warehouse of Buffalo, Inc., covering the entire second floor. In late December, 1971, the same parties entered into a written lease for the rental period January 1 to December 31, 1972. This company, managed by William Dell, took immediate possession but, because he had no need for the small room, Mr. Dell did nothing to take possession of it. DiChristopher told Dell that the former tenants had some material stored there and would move it out soon. Dell said that he had no objection. Like DiChristopher, Dell had no key to the lock placed on the door by Abbarno and Pelitieri.

On January 3, 1972, the Secret Service arrested Salvatore Cieri for possession of $40,000 worth of counterfeit $20 bills. A few days after his arrest, on January 10, 1972, Cieri told Secret Service Agent Douglas Callen that he saw a printing press and other printing paraphernalia on the second floor of a warehouse at 1738 Elmwood Avenue. He also told the agent that he had been told that the press was used for making counterfeit money.

This statement was orally made and on the record before the court was the only information given to the Secret Service by Cieri on January 10. Later in the month, on January 21, 1972, Cieri, with his attorney present, gave a detailed signed statement to Agent Callen. The statement was not sworn to, but was witnessed by the agent and the attorney. In the statement Cieri explained that in September or October, 1971 he loaned $3,000 to Abbarno and Pelitieri for a counterfeiting scheme. He described a visit to the warehouse at 1738 Elmwood Avenue which occurred some time in October or November, 1971 in the following way:

. . . At this time John [Pelitieri], Mike [Abbarno] and myself went in Mike's car to a warehouse at 1738 Elmwood Avenue, Buffalo, N. Y. We entered the building and went to the second floor and John showed me in one of the offices where there was a printing press and some paper. At this time I also noticed a draftsmans board with a magnifying glass attached in the same office. John explained that this was the office being used and that they had changed the operation so that they would now print twenty dollar ($20) bills instead of ten dollar ($10) bills that they first told me about.

Approximately two weeks later, after I had again contacted John and Mike about the money, they drove me to the press, previously mentioned, at the location on Elmwood Avenue and we entered the office. At this time John presented me with a sheet which contained three (3) backs representing a $20 counterfeit note. John told me at this time not to worry about my money and that I was not being hustled and that I now had proof of what they were doing. Approximately two (2) weeks later, after a telephone conversation with John, I met with John and Mike at Tom's Texas Hots, 803 Tonawanda St., Buffalo, N. Y. At this time I was told by John and Mike that the money was almost ready and they told me that instead of the original plan they promised that they would give me $30,000 counterfeit plus $1,000 genuine as return on my investment.

About 2 days later on a Sunday, I called John and Mike and they told me the money was ready and to meet them at the warehouse. I drove to the warehouse and went in and met John and Mike. At this time they gave

me $30,000 in counterfeit $20 FRN's from a chest in the printing office. At this time I observed a great deal more counterfeit money in this chest and John had explained to me that they had printed $1,200,000.00 in the $20 notes instead of $600,000.00 in $10 notes they had originally planned.

Cieri further admitted that he had sold counterfeit money received from Abbarno and Pelitieri to various individuals in Buffalo and Niagara Falls, and Dayton, Ohio. He gave the details leading up to his arrest on January 3, when he attempted to sell $40,000 in counterfeit money which he had received from Pelitieri.

On January 28, 1972 Secret Service Agent Earl Devaney and another agent went to the second floor of the warehouse. Devaney told Mr. Dell that he was investigating a counterfeit case and asked if he could look around the premises. Dell gave him permission to do so. When Devaney came to the locked door marked "Ladies—First Aid," he was able to look through a hole in the door and see a printing press. Dell told Devaney that he did not have a key, but that he had absolutely no objection to the agents going in the room. He testified that he wanted to cooperate with the Secret Service. A check was also made with Mr. DiChristopher to see if he had a key. He said that he did not, but told the agents that he would have no objection if they broke down the door to enter the room. In spite of the consents given by Dell and DiChristopher, the agents went to United States Magistrate Edmund F. Maxwell late in the day of January 28, 1972 to apply for a search warrant for the room where Agent Callen had observed the printing press, and to apply for arrest warrants for John Pelitieri and Michael Abbarno.

The three separate applications with papers attached were handed to the Magistrate at the same time. Attached to the application for the search warrant

was an affidavit by Douglas I. Callen. Callen's affidavit read as follows:

I, Douglas I. Callen being duly sworn deposes and says that I am a Special Agent of the United States Secret Service and employed by Law to conduct investigation and to make arrest for offenses enumerated in Sections 471, 472, 473, and 474 U.S.Code, Title 18.

On or about January 10, 1972, Salvatore L. CIERI, Jr., who had been arrested on or about January 3, 1972 for possession of $40,000 in counterfeit currency, informed me that he saw a printing press and other printing paraphernalia located on the premises of 1738 Elmwood Avenue, on the 2nd floor, Buffalo, New York, which he was told was used for making counterfeit money.[1] On this date, January 28, 1972, SA Earl E. Devaney of the United States Secret Service informed me that he was at the premises of 1738 Elmwood Avenue, which is a warehouse, that he was on the 2nd floor towards the front side of said premises and that he peered through a crack in the door which was labeled "Women" & "First Aid", whose door is painted green. He further informed me that through the crack in the door, he saw a printing press and certain other printing paraphernalia. He further informed me that the Ladies Room was part of the space leased by ABC Warehouse of Buffalo & Co. That the manager of the aforementioned company, Mr. William Dell stated that he could enter the room and that a man who identified himself as Mr. DiChristopher, the owner of the warehouse stated that he could break down the door.

The application for the arrest warrants had attached as part of the agent's affidavit the statement of Salvatore Cieri previously referred to, and also a similar statement of a Raymond J. Culotta. Mr. Culotta's statement recited in-

---

1. After Mr. Maxwell originally examined the papers, Callen inserted the phrase, "which he was told was used for making counterfeit money."

stances of receiving counterfeit notes from Pelitieri and Abbarno, but said nothing about the location of the press.

After the agent received the warrants from the magistrate, he proceeded to the warehouse where he was met by his superior, Daniel Hurley, by Mr. DiChristopher and by DiChristopher's attorney. Dell and DiChristopher were notified of the search warrant and both again said that they had no objections to the agents breaking into the room. The agents then broke the door, entered the room and seized the printing press and other equipment.

■■ Where effective consent is given, evidence seized in a search may be used against a defendant even though the search was conducted without probable cause. The consent may be given by the defendant himself or, in certain situations, by third persons. *See* Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The determination whether valid consent has been given by a third party involves a two-fold factual inquiry. First is the question whether the defendant may be said to have exhibited an actual expectation of privacy which society recognizes as reasonable. *Cf.* Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Thus, in Frazier v. Cupp, *supra*, consent by the defendant's cousin to a search of a duffel bag jointly used by them was held to be effective against the defendant because he "must be taken to have assumed the risk that [the cousin] Rawls would allow someone else to look inside." 394 U.S. at 740, 89 S.Ct. at 1425. In Bumper v. North Carolina, *supra*, the court seemed to rely upon a property theory in intimating that a voluntary consent by the defendant's grandmother, with whom he lived, would have been effective against him because she "owned both the house [searched] and the rifle [seized]." 391 U.S. at 548, n. 11, 88 S.Ct. at 1791. Nonetheless, it can be said that *Bumper* is not inconsistent with the *Katz*

approach, for the defendant could not have a reasonable expectation of privacy where both the premises and the items seized were owned by someone else. The second inquiry to make in determining whether the third person has given effective consent to search is whether the consent was voluntarily given. *See* Bumper v. North Carolina, *supra.* The government has the burden of proving that consent was freely and voluntarily given. 391 U.S. at 548, 88 S.Ct. 1788.

■ Applying the foregoing analysis, the court concludes that in the instant case effective consent to search of the premises at 1738 Elmwood Avenue was given by Dell and DiChristopher. Even if the defendants had an actual expectation of privacy to the room marked "Ladies—First Aid," it cannot be said that under the circumstances this expectation was reasonable, for the room was in a warehouse where it could be expected that many members of the public would be present, not in a private dwelling, and the room was not in the original area which they had rented from DiChristopher. The equipment was moved into this room without obtaining the prior assent of DiChristopher and, when they informed him of the move, they indicated that they would remove the material completely from the premises in "a couple of days." Yet, at the time of the search, almost three months had elapsed since the transfer to the room. Simply placing a lock on the door of the room for which they had never paid rent could not give them a reasonable expectation of privacy, even though they alone had the key. After informing the owner that they would remove the equipment within a few days, they did nothing further with it and had no further contact with him for a period of almost three months.

Defendants argue that neither DiChristopher nor Dell had authority to give consent to search in the absence of a prior eviction proceeding against them. In Jones v. United States, *supra,* 362 U.S. 257, at 266, 80 S.Ct. 725, at 733, the Supreme Court observed that the law

relating to Fourth Amendment rights is not governed by the "body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical." Since the defendants, without prior permission, moved their equipment to a room not included in the area for which they had paid rent, the court is not convinced that a landlord-tenant relationship was entered into. Even so, the court must take into account not merely whether there was a landlord-tenant relationship between them, but all of the circumstances, to determine whether a consent could be given. "Consent to a search is effective when given by one whose right to occupancy or possession is at least equal to that of the person contesting the search." United States v. Gargiso, 456 F.2d 584 (2d Cir., 1972).

■ The court believes that the recital of facts made at the outset of this opinion indicates that the consent to search was freely and voluntarily given by DiChristopher and Dell. Unlike Bumper v. North Carolina, *supra*, they consented to the search before the Secret Service agents obtained the search warrant. Their position throughout was that they wanted to cooperate with the agents and had no objection to the search. The agents obtained the search warrant solely as a precautionary measure.

■ The government also argues that the search warrant properly gave the agents the right to search the room. Standing alone, the affidavit of Douglas Callen in support of his application for a search warrant is brief, but it is sufficient to provide probable cause for the issuance of the warrant. From the affidavit alone, the magistrate knew that a Salvatore Cieri who was arrested for possession of $40,000 in counterfeit money told the agent that he was informed that a printing press at 1738 Elmwood Avenue was being used for printing counterfeit money. The magistrate knew that an agent saw a printing press in the area where Cieri said it would be. *Compare* McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), and Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), on the question of probable cause. Furthermore, the magistrate was not asked to depend upon the hazy representation of an unidentified informant.

Defendants argue that the magistrate mistakenly credited the information that the press was used to make counterfeit money for the person who told this to Cieri was not identified. But we are concerned here not with certainties but with probable cause. Agent Devaney was able to assure the magistrate that there was a printing press in the room. There is good reason to assume that a man like Cieri, who had $40,000 in counterfeit notes in his possession, would be an individual who had knowledge of their manufacture and, after his arrest, would be willing to give this information to the officers. On that score, the defendants' argument that the magistrate should have rejected information coming from Cieri because he was trying to ingratiate himself with the agents does not stand up. Cieri's information about the press was the kind which could easily be verified. Considering all of the circumstances, the search warrant was properly issued upon Agent Callen's affidavit alone.

The government urges an additional reason why the search warrant given by the magistrate should be upheld. He considered all three applications at the same time. Attached to the arrest warrants in each case was an affidavit of Agent Callen. His affidavit recited generally that the defendants did possess, sell and transfer certain counterfeit obligations, and that the complaint was based upon "the attached statements of Salvatore Cieri dated Jan. 21, 1972 and Raymond Culotta dated Jan. 24, 1972 which statements were made in my presence."

■ The prosecutor's proposal to have the magistrate testify at the hearing about the circumstances surrounding the

application was not permitted by the court because oral testimony to determine whether or not probable cause existed for the issuance of a warrant should not be permitted under Rule 41. United States v. Sterling, 369 F.2d 799, 802, n. 2., and United States v. Melville, 309 F.Supp. 829, 832 (S.D.N.Y.1970). On the other hand, the court did consider the fact that the three applications were presented to him and were executed by him contemporaneously.

In United States v. Serao, 367 F.2d 347 (2d Cir. 1966), four simultaneous applications for warrants directed to four different premises were presented to the Commissioner. The defendants claimed that the supporting affidavit for one of the warrants was deficient. In upholding the warrant, the court observed, 367 F.2d at 350:

> . . . It would be hypertechnical for the Commissioner not to act upon an entire picture disclosed to him in interrelated affidavits presented to him on the same day. And, as the United States Supreme Court admonished in United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965), "the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner."

*See also,* United States v. Markis, 352 F.2d 860 (2d Cir. 1965).

■ The fact that the underlying affidavits in the *Serao* case was based upon agents' personal observations does not distinguish that case from this since the magistrate is entitled to rely upon hearsay in determining whether a warrant should issue. The statement of Cieri about his involvement with the defendants and the location of the press was detailed and, under the circumstances, worthy to be relied upon by the magistrate.

The motions of defendants to suppress the evidence seized as a result of the search of the room described in the search warrant are denied.

So ordered.