**UNITED STATES of America,
Plaintiff,**

v.

**Ricky James BOTELHO, Defendant.
Crim. No. 13126.**

United States District Court,
D. Hawaii.

June 29, 1973.

 621

William C. McCorriston, Asst. U. S. Atty., Harold M. Fong, U. S. Atty., Honolulu, Hawaii, for plaintiff.

James T. Leavitt, Jr., Hart, Sherwood, Leavitt, Blanchfield & Hall, Honolulu, Hawaii, for defendant.

## DECISION AND ORDER

SAMUEL P. KING, District Judge.

Defendant is charged with possession of an unregistered firearm—a sawed-off shotgun—in violation of 26 U.S.C. § 5861(d) (Supp.1973). The shotgun was taken from defendant's bedroom on July 15, 1972, during a warrantless police search authorized by the nonresident owner of the premises.

On March 16, 1973, defendant moved to suppress the shotgun as evidence on the ground that it was seized in violation of his Fourth Amendment right to be secure from unreasonable searches and seizures. This motion was heard and denied on May 8, 1973. Thereafter on May 18, 1973, defendant filed a Motion For Reconsideration and it is this motion that is now before the court.

After careful consideration, I have concluded that my original ruling was incorrect and that the shotgun must be suppressed as the fruit of an unlawful search.

### Facts

The facts developed at the hearing on the Motion To Suppress established that the defendant and others resided in a beach cottage located at 94 Alii Drive, Kailua, Kona, Hawaii, leased from Mrs. Mary L. MacIsaac. The lease was oral and was understood to be from period to period with payments of rent to be prepaid every two weeks. Mrs. MacIsaac reserved a specific right of re-entry upon the premises in the event of a default in rental payments.

The original lessees were two men, one of whom had moved and been replaced by defendant in an informal manner that left his exact relationship to the landlady unclear. However, testimony by Mrs. MacIsaac showed that she was aware of defendant's presence and had accepted one rental payment from him. There was at least one other person, besides the two lessees, occupying the premises.

After June 30, 1972, the defendant and the other occupants of the cottage were at all times delinquent in their rental payments to Mrs. MacIsaac. They also failed to make required payments for electricity and toll telephone calls. After several unsuccessful demands for these payments, Mrs. MacIsaac and her husband met with the defendant and the other lessee on July 10, 1972, and informed them that they would be evicted on July 15th unless all bills due and owing were paid by July 14th. Mrs. MacIsaac did not, however, give the tenants any written notice of eviction.

No monies were received by July 14, 1972. On the following day, July 15th, Mrs. MacIsaac and her husband went to the beach cottage for the purpose of cleaning it preparatory to leasing it to new tenants. They arrived at approximately 2:15 p. m. When no one responded to their knock, they entered the cottage where they discovered the sawed-off shotgun mounted on the wall of defendant's bedroom. Mrs. MacIsaac then summoned the county police.

When the police arrived, Mrs. MacIsaac and her husband were waiting for them outside of the cottage. Upon request, Mrs. MacIsaac freely consented to a search of the premises and led the police to the shotgun. The shotgun was then seized as evidence and removed from the cottage. A warrant was never obtained, and the police relied exclusively on Mrs. MacIsaac's consent as authorization for their search and seizure.

Following this search, the cottage was placed under surveillance. When the defendant returned home later that day, the police questioned him and requested his consent to make a further search. At this point the record is unclear. Defendant apparently gave his permission, but no additional evidence was found. In any event, defendant was not arrested at this time.

In the subsequent weeks, defendant and the other co-tenants continued to live in the cottage. Mrs. MacIsaac was advised by both the police and her attorney to "stay away" from the cottage, and made no further efforts to personally evict the tenants. Instead, she instituted summary eviction proceedings. However, before the sheriff could serve any of the tenants, they vacated the premises. This occurred at approximately the end of July.

Despite the tenants' continued possession of the cottage, Mrs. MacIsaac has never received rental payments for any period after June 30th.

The shotgun seized on July 15th was subsequently turned over to federal authorities. On the basis of this evidence, defendant was indicted on October 6, 1972, by a federal grand jury for possession of an unregistered firearm. He was arrested soon thereafter.

### Discussion

There are actually three searches involved in this case: first, the initial search by Mrs. MacIsaac and her husband which discovered the shotgun; second, the police search authorized by Mrs. MacIsaac which confirmed the existence of the shotgun and in the course of which the shotgun was seized as evidence of a violation of 26 U.S.C. § 5861(d); and third, the police search authorized by the defendant.

In his Motion To Suppress, defendant raised objections to the first and second searches.[1] However, in his Motion For Reconsideration, he has not renewed his objection to the search conducted by Mrs. MacIsaac and her husband. Defendant apparently concedes that the Fourth Amendment is solely directed at police misconduct, not at that of private persons. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); Eisentrager v. Hocker, 450 F.2d 490, 492 (9th Cir. 1971); Duran v. United States, 413 F.2d 596, 608 (9th Cir. 1969). Thus even assuming *arguendo* that Mrs. MacIsaac and her husband were trespassing, any evidence that they produced would not be excludible on Fourth Amendment grounds in the absence of any taint of police connivance or cooperation.

The only issue before the court, then, is the legality of the first police search in the course of which the shotgun was seized. Warrantless police searches are *"per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Coolidge v. New Hampshire, 403 U.S. 443, 454–455, 91 S. Ct. 2022, 2032, 29 L.Ed.2d 564 (1971), quoting Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). One such exception is that of a consent search and it is on this ground that the government seeks to justify the search in question here. The government bears a special burden under the circumstances of this case because "[a] consent search, in general, is a search consented to by the person affected. Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946). Thus, in most cases the warrantless search of leased premises with only the permission of the landlord is unconstitutional. Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961)." State v. Taggart, 491 P.2d 1187, 1188 (Ct.App.Or.1971). See also, Stoner v. California, 376 U.S. 483, 84 S. Ct. 889, 11 L.Ed.2d 856 (1964).

The government argues that *Chapman, Stoner* and *Taggart* are not applicable here because the defendant's tenancy had been terminated at the time his landlady gave her consent to the police search either by reason of his nonpayment of rent after June 30th or the notice to vacate given on July 10th.[2] Thus his continued possession of the cottage on July 15th, the day of the search, was unlawful and Mrs. MacIsaac had full authority to permit the police to enter and search. Three cases have been cited as support for this contention—Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); Eisentrager v. Hocker, *supra*; and United States v. Paroutian, 299 F.2d 486 (2d Cir. 1962)—but none of them actually reach the issue presented here.[3]

1. No objection to the third search has ever been raised for the obvious reason that no evidence was found.

2. The government has not questioned defendant's status as a lessee. This seems proper in view of Mrs. MacIsaac's apparent acquiescence in defendant's replacement of one of the original lessees.

3. The *Abel* and *Eisentrager* cases dealt with defendants who had "abandoned" leased premises, rather than the question of nonpayment of rent or eviction.

The proper inquiry is, I believe, whether the defendant had a reasonable expectation of privacy in the area searched. As discussed by Justice Harlan in his concurring opinion in Katz v. United States, *supra,* 389 U.S. at 361, 88 S.Ct. at 516, this test involves "a two-fold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable'."

■■ With respect to the first part of this test, there is little doubt that defendant subjectively believed that he had a right to privacy in the cottage. No effort was made to hide the shotgun; indeed, it had been mounted on the wall of defendant's bedroom.[4] And despite the notice of eviction given by Mrs. MacIsaac, defendant and the other co-tenants did not vacate the premises or manifest any intention of doing so until several weeks after the July 15th search. Thus it only remains to determine whether defendant's expectation of privacy was "one that society is prepared to recognize as 'reasonable'." *Id.*

■ Rephrased in the terms of Justice Harlan's test, it is the government's argument that the notice to vacate terminated defendant's tenancy and therefore any expectation of privacy he may have had was unreasonable. It seems to me that this argument would be sound except for the fact that the notice given by Mrs. MacIsaac on July 10th was clearly inadequate under Hawaii law. Hawaii Rev.Stat. § 666–2 provides in pertinent part, that:

> Notwithstanding other provisions of law to the contrary, when real property is rented for an indefinite time with . . . periodic rent reserved, such holding shall be construed to be a tenancy . . . from period to period on which rent is payable, and shall only be terminated by written notice to vacate . . . given twenty-five days or more preceding the end of any . . . period by either landlord or tenant to the other; provided . . . *that when a tenant under such a tenancy fails to pay the rent reserved at the time agreed upon, the landlord may terminate the tenancy by giving to the tenant a written notice to vacate of not less than five days.* [Emphasis added].

The requirement of written notice is not a paper formality because statutes pro-

---

For example, in the *Eisentrager* case, the court stated that:

> . . . the presence of the hidden corpse [the body of Mrs. Eisentrager] was the strongest possible evidence to lead her [the landlady] to believe that Eisentrager had abandoned the apartment, regardless of what personal effects he may have left behind. . . . At that point the landlady, as owner, had a right to take possession of the apartment, and to invite the police to enter and search. Thus no rights of Eisentrager were invaded by the police. 450 F.2d at 491–492.

*Paroutian* involved police searches of a leased premises *prior to* any eviction efforts by the landlord. Under those circumstances, the *Paroutian* court held that the searches were illegal.

4. Because the shotgun was located in a private dwelling and thus was not "in the plain view of [a police] officer who has a right to be in the position to have that view," see Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 21 L. Ed.2d 145 (1968), it is clear that the search involved here could not be justified under the plain view doctrine. As explained in Coolidge v. New Hampshire, *supra,* 403 U.S. at 466, 91 S.Ct. at 2038, "[w]hat the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure." There was no prior justification for the search in question here, and "plain view *alone* is never enough to justify the warrantless seizure of evidence." [Emphasis by the Court] *Id.* at 468, 91 S.Ct. at 2039.

viding for possessory or summary remedies of a landlord against a tenant must be strictly construed. 50 Am.Jur.2d Landlord and Tenant § 1228. Accordingly, the tenancy of the premises was not terminated by Mrs. MacIsaac's verbal notice of eviction.

Nor do I believe that the nonpayment of rent would, without more, make the defendant's expectation of privacy unreasonable.[5] See United States v. Olsen, 245 F.Supp. 641 (D.Mont.1965); State v. Taggart, *supra*. As noted by Chief Judge Schwab in his opinion in *Taggart*:

> To hold otherwise would abolish the protections of the Fourth Amendment for a potentially large group of persons renting homes and apartments. For it is not unreasonable to assume that at one time or another many renters have been more than ten days late [the statutory grace period] with a monthly rent payment. Whatever effect this may have on their property rights in the leased premises, . . . we cannot conclude that being late with a rent payment in itself curtails their constitutional rights. 491 P.2d at 1189.

Moreover, in view of the mandatory and exclusive nature of § 666–2 ("Notwithstanding other provisions of law to the contrary . . . a tenancy from period to period . . . shall only be terminated . . . ." See text quoted above), the fact that the landlady reserved a right to re-enter on the failure to pay rent is immaterial. It is the better and more modern rule that a landlord entitled to possession by right of re-entry or otherwise must, on the refusal of the tenant to surrender the leased premises, resort to the remedy given by law to secure it.[6] Any other rule is prejudicial to the public peace and order.

■■ It is therefore my opinion, and I so hold, that defendant's occupancy of the cottage on July 15th was lawful under state property law. Because consent to a search is effective only when given by one whose right to occupancy or possession is at least equal to that of the person contesting the search, Frazier v. Cupp, 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); United States v. Gargiso, 456 F.2d 584, 587 (2d Cir. 1972), the landlady had no authority to permit the police search involved here and the shotgun must be suppressed. See generally, United States v. Abbarno, 342 F.Supp. 599 (W.D.N.Y.1972) for this same type of analysis though reach-

---

5. Because of the transitory nature of most motel and hotel rental arrangements, nonpayment of rent in that context might well require a different rule. See State v. Roff, 70 Wash.2d 606, 424 P.2d 643 (1967); State v. Dougherty, 493 P.2d 1383 (Ct.App.Or.1972).

6. Though the right to self help was recognized in Gomes v. Perry, 26 Hawaii 661 (1922), that case predated the enactment of § 666–2 by seven years. See Hawaii Sess.L.1929, ch. 93 § 2. Chu v. Wong, 39 Hawaii 278 (1952), cited by the government as expressly reaffirming the rule of *Gomes*, merely held that *Gomes* was not applicable to that case. The decision neither approved nor disapproved the principle of self help. Defendant, for his part, cites Kong Kee v. Kahalekou, 5 Hawaii 548 (1886), which held that where a statute prescribes a method of redress to a landlord, the statute must be

followed. In view of the confusion of the authorities, it seems appropriate to conclude that the Supreme Court of Hawaii presently has no rule of law with respect to self help, and that in the absence of any such determination, § 666–2 is controlling. My conclusion is strengthened by the recent enactment of a new residential landlord-tenant code, effective January 1, 1973. Section 521–68 (Supp. 1972) of the code provides that any time after rent is due, the landlord may "demand payment thereof and notify the tenant in writing that unless payment is made within a time mentioned in the notice, not less than five business days after receipt thereof, the rental agreement will be terminated. *If the tenant remains in default, the landlord may thereafter bring a summary proceeding for possession of the dwelling unit or any other proper proceeding, action, or suit for possession.*" [Emphasis added].

ing a different result under the circumstances of that case.[7]

■ The government argues alternatively that property law should not be controlling in determining the scope of Fourth Amendment protections. It reasons that despite the invalidity of the notice of eviction the defendant could not have had a reasonable expectation of privacy in any part of the cottage when the rent, electricity and telephone bills were unpaid, and the landlady had informed him to be out of the premises by July 15th. While persuasive in some respects, I cannot agree with the government's contention. Although the Supreme Court has stated that it is "unnecessary and ill-advised" to import property law concepts into the law surrounding Fourth Amendment rights, Jones v. United States, 362 U.S. 257, 266, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), it is obvious that this was intended to broaden the protection afforded against unreasonable searches and seizures, not

narrow it. Furthermore, I am not prepared to hold that a defendant with a perfectly legal right to possession or occupancy of leased premises can be found to have an "unreasonable" expectation of privacy.

■ The government's final argument, relying on Duran v. United States, 413 F.2d 596 (9th Cir. 1969) and dicta in Eisentrager v. Hocker, *supra*,[8] is that the discovery of the shotgun is the significant event for purposes of the Fourth Amendment, not its subsequent seizure by the police: "[t]he crucial factor in determining whether the police or government is involved in a search is to ascertain the government's role *in the discovery of the seized evidence*." Government's Memorandum In Opposition to Defendant's Motion For Reconsideration at 5. [Emphasis by the Government]. It is presupposed "that once evidence is uncovered, it will be turned over to the police or government officials." *Id.* at 6. Since there was no police participa-

7. In *Abbarno*, the defendants had rented part of a warehouse on a month-to-month arrangement and, after being told by the warehouse owner to move out to make room for a new tenant, they moved their equipment (later found to include counterfeiting paraphernalia) into a small room which was not in the original rented area and which was marked "Ladies—First Aid." They told the owner they would remove the equipment in a few days but did not do so. They paid no further rent, but they did place a lock on the door and the owner took no action to move them out. Approximately three months later, Secret Service agents searched the room with the consent of the owner and the new tenant, and seized the counterfeiting paraphernalia. The court held that even if defendants had an expectation of privacy, it was unreasonable:

> [I]t cannot be said that under the circumstances this expectation was reasonable, for the room was in a warehouse where it could be expected that many members of the public would be present, not in a private dwelling, and the room was not in the original area which they had rented from DiChristopher [the owner]. The equipment was moved into this room without obtaining the prior assent of DiChristopher and,

when they informed him of the move, they indicated that they would remove the material completely from the premises in 'a couple of days.' Yet, at the time of the search, almost three months had elapsed since the transfer to the room. Simply placing a lock on the door of the room for which they had never paid rent could not give them a reasonable expectation of privacy, even though they alone had the key. After informing the owner that they would remove the equipment within a few days, they did nothing further with it and had no further contact with him for a period of almost three months. 342 F. Supp. at 604.

8. The dicta relied on by the government is found on page 492 of 450 F.2d of the *Eisentrager* opinion. After stating that evidence of crime, found by a private party while trespassing on private property, is not excludible under the Fourth Amendment, the court went on to say: "[w]e decline to hold that, in order to protect Eisentrager's privacy, the landlady should have dragged the body [of Mrs. Eisentrager] outside the apartment to turn it over to the police, and then demanded a search warrant before letting the police into the apartment."

tion in the "discovery" of the illegal weapon, the argument concludes that there was no violation of the Fourth Amendment.

In my opinion, the government misreads *Duran* and *Eisentrager*. In *Duran,* heroin was discovered by a motel manager in a room "eleven hours after the defendants . . . had left the motel room, and after their occupancy of the room had been terminated." 413 F. 2d at 608. Further, the motel manager, "of her own volition, handed the results of her private examination of the room over to the police." *Id.* These facts differ markedly from those in the instant case: first, it is apparent that both the discovery and the seizure were done by the motel manager, and that no police search was involved; second, the occupancy of the defendants had been terminated; and third, it could well have been considered that the heroin had been abandoned. *Eisentrager* has a more closely analogous fact situation, but it is clearly an abandonment case and should not be read for any broader proposition. See footnote 3 *supra.*

More importantly, if the government's argument were to prevail, it would severely undermine the most important procedural safeguard of the Fourth Amendment: every citizen's right to have a disinterested magistrate make the determination authorizing police searches and seizures. As discussed by Justice Jackson in Johnson v. United States, 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948):

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent. [Footnotes omitted].

Thus the police should have used the landlady's discovery of the shotgun as probable cause for the issuance of a warrant. Yet they did not secure a warrant and "[b]elief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant. And such searches are . . . unlawful notwithstanding facts unquestionably showing probable cause." Chapman v. United States, *supra,* 365 U.S. at 613, 81 S.Ct. at 778, quoting Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925). See also, Jones v. United States, *supra,* 362 U.S. at 497–498, 80 S.Ct. 725; United States v. Jeffers, 342 U.S. 48, 51–52, 72 S.Ct. 93, 96 L.Ed. 59 (1951).

Accordingly, defendant's Motion for Reconsideration is granted and the shotgun is suppressed as evidence.

It is so ordered.