**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jerry DIGGS, Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Peter OLIVEREZ, Defendant-Appellant.**

**Nos. 79–1741, 79–1753.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 10, 1980.

Decided June 29, 1981.

Rehearing Denied Aug. 14, 1981.

Harold L. Perry, Oakland, Cal., for defendant-appellant Oliverez.

Jerrold M. Ladar, Stephen W. Sommerhalter, San Francisco, Cal., for defendant-appellant Diggs.

Jo-Lynne O. Lee, Asst. U. S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before TRASK and KENNEDY, Circuit Judges, and TASHIMA, District Judge.*

* Honorable A. Wallace Tashima, United States District Judge for the Central District of California.

TRASK, Circuit Judge:

This is a consolidation of two criminal appeals. Appellants Diggs and Oliverez were each indicted on two counts of mail and wire fraud and one count of conspiracy to commit mail and wire fraud, 18 U.S.C. §§ 371, 1341, 1343. A jury found them guilty on all counts. Appellants make various assignments of error relating to the admissibility of certain evidence, the sufficiency of the evidence supporting the jury verdict, and the district court's denial of several defense motions. We affirm.

## I

Appellants' fraudulent scheme involved the issuance of negotiable paper—e. g., certificates of deposit and letters of credit—by a fictitious bank owned by Diggs (the Bank).[1] Such paper was used by Bank clients to obtain legitimate bank loans for which they otherwise did not qualify because of insufficient collateral. A client would list the worthless paper as a personal asset on his or her loan application, and the Bank would vouch for the existence and declared value of the paper. As a fee for this service, the Bank received a portion of the loan proceeds, usually ten percent. Oliverez functioned as the Bank's "exclusive agent" in the United States, for which he received forty percent of all service fees paid to the Bank by clients that he had solicited.

Three attempted loan transactions formed the basis of the indictment. In the first, a rancher needed a letter of credit to obtain a commercial loan from the First Security Bank of Idaho. The Bank agreed to supply the letter for a fee, and subsequently represented to First Security that it was financially capable of providing 100 percent loan guarantees. In the second,

some importers needed security or a guarantee to obtain a loan of $100,000 from the Genossenschaft Bank of West Germany. During negotiations with the importers, Diggs and Oliverez told them that the Bank had assets of $40,000,000. The Bank eventually issued a $100,000 certificate of deposit in return for $10,000, and telexed Genossenschaft to confirm issuance of the certificate.

The last transaction involved issuance of a letter of credit for four and one-half million dollars to Grebe, an individual who required financing to develop oil fields in West Virginia. The transaction was handled primarily by Grebe's attorney, Miller. During negotiations, Oliverez told Miller that the Bank was a licensed, full-service investment bank with United States assets of $50,000,000 against only $190,000 of liabilities, in addition to substantial off-shore assets. He further told Miller that the Bank had recently undergone an independent audit which confirmed these figures. In response to inquiries from Grebe's contemplated lender, the Bank sent through the mails bogus financial statements purporting to show its multi-million dollar net worth.

A federal grand jury returned an indictment charging Diggs and Oliverez with two counts of mail fraud, two counts of wire fraud, and one count of conspiracy to commit mail and wire fraud in connection with their operation of the Bank. After a ten-day trial, a jury returned verdicts of guilty on all counts as to both defendants.

## II

Diggs contends that the district court erred in denying his pre-trial motion to suppress evidence seized pursuant to a subpoena duces tecum issued to the owner of a

---

1. Diggs had obtained from the government of Saint Vincent, British West Indies, a certificate of registration for the operation of the First National Bank of the Caribbean, Ltd. Although the Bank listed its capital as $500,000 in Eastern Caribbean dollars, it actually possessed no capital or assets of any kind. The Bank's registered address was that of Diggs' attorney, who did not participate in management of the Bank and had no knowledge of the Bank's financial status. The Bank's Board of Directors consisted of three female acquaintances of Diggs who likewise were unaware of the Bank's operations. Diggs listed a prestigious accounting firm as the Bank's independent auditors, although this firm had not done any work for the Bank or authorized the Bank to use its name.

motel. The motel was Diggs' residence during the period when the acts forming the basis of the indictment were alleged to have occurred. The court denied the motion, finding the evidence seized to have been abandoned property.

A warrantless search or seizure of abandoned property is not unreasonable under the Fourth Amendment. *Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960); *United States v. Kress*, 446 F.2d 358, 361 (9th Cir. 1971). The test of abandonment is whether the alleged owner has retained a reasonable expectation of privacy in the articles alleged to have been abandoned. *United States v. Haddad*, 558 F.2d 968, 975, n.6 (9th Cir. 1977); *United States v. Wilson*, 472 F.2d 901, 903 (9th Cir.), *cert. denied*, 414 U.S. 868, 94 S.Ct. 176, 38 L.Ed.2d 116 (1973). A finding of abandonment is reviewed under the clearly erroneous standard. *United States v. Humphrey*, 549 F.2d 650, 652 (9th Cir. 1977).

Diggs argues that the finding of abandonment was erroneous. He relies for this conclusion on *United States v. Botelho*, 360 F.Supp. 620 (D.Haw.1973). In that case, the court held that tenants who had not been given a notice to vacate leased premises, as required by Hawaii law, retained a reasonable expectation of privacy in those premises even though they had not paid their rent. *Id.* at 626. Because he was never given a formal notice of eviction by the motel, Diggs argues that he cannot be found to have abandoned the property that he left there.

We do not view *Botelho* as persuasive authority. The test in this circuit for determining whether property is abandoned is not "whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the articles al-

leged to be abandoned." *United States v. Wilson, supra*, 472 F.2d at 902. Here there is ample evidence that Diggs had no such expectancy. Diggs left his room at the motel owing $1,000 in back rent, and was not seen or heard from after August 25, 1978. The motel terminated his tenancy after it received in the mail the key to Diggs' former room instead of the payment which Diggs had promised to send. At no time did Diggs attempt to retrieve any of the property left in the motel room.[2] The trial court's conclusion that Diggs no longer had a reasonable expectation of privacy in the articles in the room on November 2, 1978, when the subpoena was issued, was not clearly erroneous. Additionally, because Diggs abandoned the motel room long before the search, he lacked standing to challenge the breadth of the subpoena. *See Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978); *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967); *United States v. Haddad, supra*. The district court's denial of Diggs' motion to suppress is, therefore, affirmed.

### III

Oliverez contends that there was insufficient evidence as a matter of law for the jury to convict him of violating sections 371, 1341, and 1343. The standard of review of such a contention is whether the evidence, viewed in the light most favorable to the government, was sufficient to permit a rational conclusion by the jury that the accused was guilty beyond a reasonable doubt. *United States v. Friedman*, 593 F.2d 109 (9th Cir. 1978); *United States v. Young*, 573 F.2d 1137, 1139 (9th Cir. 1978). In making this assessment, the reviewing court should not substitute its own inferences for those of the jury. *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir.), *cert. denied*, 396 U.S. 1060, 90 S.Ct. 751, 24 L.Ed.2d 754 (1970).

**2.** Diggs' roommate, Gayda, made an arrangement with the motel to have her belongings returned to her as she paid off her half of the bill. Diggs contends that this arrangement included his property as well, apparently hoping to show thereby that he had not abandoned the seized property. Although Gayda's testimony supports this contention, the motel manager testified that the arrangements did not include Diggs' belongings. Apparently finding Gayda's testimony lacking in credibility, the district court adopted the manager's version of events.

Conspiracy is established when there is an agreement to accomplish an illegal objective or to achieve a legal objective by illegal means, an overt act in furtherance of such objective, and the intent necessary to commit the underlying offense. *United States v. Oropeza,* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978); *United States v. Friedman, supra,* 593 F.2d at 115. The conspiracy need not be proved by direct evidence; a common scheme or plan may be inferred from circumstantial evidence. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Turner,* 528 F.2d 143 (9th Cir.), cert. denied, 429 U.S. 837, 97 S.Ct. 105, 50 L.Ed.2d 103 (1975). In order to obtain a conviction for mail fraud, the government need only prove that the defendant was a knowing participant in a fraudulent scheme that utilized the mails. *United States v. Price,* 623 F.2d 587 at 591–592 (9th Cir. 1980); *United States v. Beecroft,* 608 F.2d 753, 757 (9th Cir. 1979). Likewise, to prove a charge of wire fraud, the government need only show that the defendant knowingly participated in a scheme to defraud others by use of interstate communications

facilities. *United States v. Corey,* 566 F.2d 429, 430 n.2 (2d Cir. 1977); *United States v. Wise,* 553 F.2d 1173, 1174 (8th Cir. 1977).

In the present case, the government established that there was an agreement between Oliverez and Diggs whereby Oliverez would act as the Bank's agent in the United States and receive a portion of the service fees collected by the Bank. Oliverez made false and fraudulent representations in two of the transactions charged in the indictment,[3] and there is strong evidence to support the inference that he did so knowingly.[4]

Viewing the evidence in the light most favorable to the government, we conclude that the jury could reasonably have found that there was an agreement between Oliverez and Diggs to accomplish an illegal objective, and that Oliverez had the requisite intent to commit mail fraud. *See United States v. Friedman, supra; United States v. Price, supra.* We also conclude that there was sufficient evidence for the jury to find that Oliverez committed both mail and wire fraud.[5]

**3.** The first real contact of the importers, Mr. and Mrs. Morandell, with the Bank was a meeting with Oliverez in which he "sounded positive" that the Bank could supply a letter of credit or certificate of deposit which would be satisfactory to the Genossenschaft Bank. During a second meeting, Oliverez heard Diggs say that the Bank had assets of $40,000,000. At a third meeting, Oliverez suggested that the Morandells pay for the certificate of deposit with the money they received from the loan from Genossenschaft Bank, which loan was itself to be secured by the certificate of deposit. The Morandells ultimately obtained a $100,000 certificate of deposit for only $10,000.

Oliverez also participated in the negotiations with Grebe and Miller. Oliverez told Miller that an ongoing audit of the Bank showed it to have assets of $50,000,000 in the United States against liabilities of only $190,000. Oliverez also told Miller that there was no risk involved in dealing with the Bank, that it was an investment bank licensed as a full-service bank, that he (Oliverez) was a consultant who had helped Diggs to form the Bank, and that the Bank's American assets were genuine.

**4.** Notwithstanding his representations to the Morandells and Miller, see note 3 *supra,* Oliverez admitted to undercover FBI agents that Diggs did not tell him much about the Bank's

operations, and that he believed that Diggs was not being candid about the extent of the Bank's offshore assets. He also admitted knowing that the Bank could not issue certificates of deposit or letters of credit in the United States if it was legally to avoid U.S. banking regulations, and confessed to being unable to verify that the Bank had any assets. *Cf. United States v. McDonald,* 576 F.2d 1350, 1358 (9th Cir.) (awareness of a high probability of fraud coupled with conscious avoidance of the truth may support a conviction of mail fraud), cert. denied, 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978); *United States v. Love,* 535 F.2d 1152, 1158 (9th Cir.) ("reckless indifference" as to the truth or falsity of a representation satisfies requirement of acting knowingly), cert. denied, 429 U.S. 847, 97 S.Ct. 130, 50 L.Ed.2d 119 (1976).

**5.** Oliverez' argument that he is not guilty of mail or wire fraud because he did not himself send, mail, or transmit any communication is without merit. *See United States v. Goldstein,* 532 F.2d 1305, 1316 (9th Cir. 1976) (not necessary to show that defendant actually placed phone calls in question when evidence showed she was part of scheme to place calls in violation of statute), cert. denied, 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1977).

## IV

At trial, a witness testified to having made three deposits in the Bank totalling $16,500 and never having recovered any of them. Diggs contends that the testimony of this witness should have been excluded under Fed.R.Evid. 403 and 404(b). Alternatively, he argues that even if the testimony is admissible, the district court erred in failing to give a limiting instruction to the jury.

This circuit has adopted the position that Rule 404(b) is an inclusionary rule—*i. e.*, evidence of other crimes is inadmissible under this rule only when it proves nothing but the defendant's criminal propensities. *United States v. Herrell*, 588 F.2d 711, 714 (9th Cir. 1978); *United States v. Sangrey, supra,* 586 F.2d at 1314. Rule 403 permits the introduction of relevant evidence of other crimes to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, and predisposition in entrapment cases, so long as its probative value is not outweighed by its prejudicial effect. The district court is accorded wide discretion in deciding whether to admit such evidence. *United States v. Clardy*, 612 F.2d 1139, 1154 (9th Cir. 1980); *United States v. Sangrey*, 586 F.2d 1312, 1314 (9th Cir. 1978); *United States v. McDonald,* 576 F.2d 1350, 1356 (9th Cir. 1978).

The disputed testimony was relevant to several aspects of this case. Both defendants argue that they were entrapped by an FBI undercover operation. When entrapment is raised as a defense, the prosecution may introduce evidence of prior conduct to show the defendant's criminal propensity and predisposition. *United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1341 (9th Cir. 1977). Here, the disputed testimony showed that Diggs was using the Bank fraudulently to obtain money from third parties before the FBI ever came on the scene. The testimony was also probative of Diggs' specific intent to defraud, *see United States v. McDonald, supra,* 576 F.2d at 1356; *United States v. Hearst,* 563 F.2d 1331, 1335 (9th Cir. 1977), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978), as well as of the fact that the Bank never possessed any assets. In view of this, we cannot say that the district court abused its discretion when it refused to exclude the testimony.

When it admitted the testimony, the court instructed the jury to consider it only as evidence of the defendants' motive and intent and of the existence of a conspiracy. Neither Diggs nor Oliverez objected to the instruction when it was given. Thus, the instruction may provide a basis for reversal only if it constituted plain error. Fed.R.Crim.P. 30, 52; *see Herzog v. United States*, 235 F.2d 664 (9th Cir. 1956), *cert. denied,* 352 U.S. 844, 77 S.Ct. 54, 1 L.Ed.2d 59 (1957). This was an adequate limiting instruction, however, and the giving of it did not constitute error at all. Accordingly, it does not constitute a ground for reversal.

## V

Because of the illness of one of the jurors, the jury was recessed from the close of presentations of evidence on August 24 until September 3, when it reconvened to hear closing arguments and receive instructions. Oliverez contends that this eleven-day separation was so prejudicial that a mistrial should have been declared. This factual situation appears to raise an issue of first impression in this Circuit. Although there are decisions involving separation of the jury during deliberations, *see, e. g., United States v. Eldred*, 588 F.2d 746 (9th Cir. 1978); *United States v. Menna*, 451 F.2d 982, 984 (9th Cir. 1971), we have found no cases, nor were any cited to us by the parties, involving separation during the course of the trial itself.

Oliverez suggests that the separation prejudiced him in three ways:

(1) The memories of the jurors were likely to have been vague after the interruption.

(2) Some jurors might have commenced deliberations about the case within themselves during the interruption, contrary to the concept of collegial jury decisionmaking.

(3) There might have been pressure for a quick verdict due to concern for the health of the recently ill juror.

The trial court has "full discretion in determining whether the jury shall be allowed to separate at any particular time during the course of the trial . . . ." *Sullivan v. United States*, 414 F.2d 714, 715 (9th Cir. 1969) (quoting *Hines v. United States*, 365 F.2d 649, 651 (10th Cir. 1966)). Our review of the record indicates that this discretion was not abused here. Oliverez has alleged only hypothetical prejudice, whereas the circuits are virtually unanimous that in order for a jury separation to constitute reversible error, the defendant must show that he suffered actual prejudice because of the separation. *E. g., United States v. Carter*, 602 F.2d 799, 805–06 (7th Cir. 1979); *United States v. Almonte*, 594 F.2d 261, 267 (1st Cir. 1979); *Blackmon v. United States*, 474 F.2d 1125, 1126 (6th Cir.), *cert. denied*, 414 U.S. 912, 94 S.Ct. 252, 38 L.Ed.2d 150 (1973); *United States v. Harris*, 458 F.2d 670, 674–75 (5th Cir.), *cert. denied*, 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972); *Cardarella v. United States*, 375 F.2d 222, 227–28 (8th Cir. 1967); *see, e. g., United States v. Siragusa*, 450 F.2d 592, 595 (2d Cir. 1971); *United States v. Weiss*, 431 F.2d 1402, 1407 (10th Cir. 1970); *Sullivan v. United States*, 414 F.2d 714, 716 (9th Cir. 1969).

The record does not disclose the existence of any actual prejudice. The district judge repeatedly admonished the jurors not to discuss the case with anyone, or even to allow anyone to approach and address them concerning it. He further instructed them not to form or express any opinion about the case until it was formally submitted to them following closing arguments. The jurors had ample opportunity to refresh their memories with respect to the evidence by listening to tapes of testimony given during the trial and re-examining exhibits. Some of them did so. Finally, the judge made sure that the juror who had taken ill was fully recovered before he permitted deliberations to continue, so that there would be no temptation to cut short deliberations out of concern for this juror's health. In view of these precautions and the complete absence of any showing of actual prejudice, Oliverez' hypothetical speculations of prejudice do not persuade us that reversal is required here. The district court's denial of Oliverez' motion for mistrial is affirmed.

## VI

Both Diggs and Oliverez argue that the trial judge erred in refusing to give the jury an instruction on their entrapment defense. Whether there exist issues of fact as to a defense of entrapment is properly a question for the trial judge, the standard of review being abuse of discretion. *See United States v. Glaeser*, 550 F.2d 483, 487 (9th Cir. 1977). The primary focus of appellate review should be on the defendant's predisposition to commit the crime rather than on the character of the government agents' actions.[6] *United States v. Russell*, 411 U.S. 423, 432–34, 93 S.Ct. 1637, 1643–44, 36 L.Ed.2d 366 (1973) (reaffirming subjective theory of entrapment articulated in *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) and *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932)); *United States v. Reynoso-Ulloa, supra*, 548 F.2d at 1334–35. Although only "slight" evidence is needed to create a factual issue and get the defense to the jury, this evidence must at least suggest that the defendant was initially unwilling to commit

---

**6.** Diggs devotes a substantial portion of his opening brief to a discussion of constitutional due process review of governmental actions that can form the basis of an entrapment defense. It has been suggested that the conduct of government agents in a particular instance might be so outrageous that constitutional review under the due process clause would be required regardless of the defendant's criminal predisposition. *See, e. g., United States v. Prai-* rie, 572 F.2d 1316, 1318–19 (9th Cir. 1978) (reading *United States v. Russell, supra*, as permitting such a constitutional defense); Tribe, *The Supreme Court, 1972 Term—Forward: Toward a Model of Roles in the Due Process of Life and Law*, 87 Harv.L.Rev. 1, 244, 251–52 (1973). However, the government's conduct in this case did not approach the "conscience-shocking" behavior necessary to trigger substantive due process review.

the crime, or that government involvement planted the criminal design in the defendant's mind. *United States v. Ratcliffe*, 550 F.2d 431, 434 (9th Cir. 1976); *United States v. Christopher*, 488 F.2d 849, 850–51 & n.1 (9th Cir. 1973). Five factors should guide a court's assessment of whether the defendant had criminal predisposition:

(1) The defendant's reputation.

(2) Whether the initial suggestion of criminal activity was made by the government.

(3) Whether the defendant engaged in the alleged criminal conduct for profit.

(4) Whether the defendant displayed reluctance to engage in the activity, which was only overcome by repeated government persuasion.

(5) The nature of the inducement or persuasion.

*United States v. Reynoso-Ulloa, supra*, 548 F.2d at 1336.[7]

▮ Oliverez' argument on this issue is without merit. He had only one encounter with government agents, during which nothing occurred to support the claim that he was pressured by the government into committing illegal acts.[8] Additionally, the contract between Oliverez and Diggs appears by its terms to have been for the personal profit of each. Nor does Oliverez point to evidence in the record showing that he was initially reluctant to act. The sole factor militating in favor of an entrapment defense is his apparent good standing in the community and lack of a criminal record. This is not enough to show entrapment.

Diggs relies on a transcript which was an exhibit at trial but never admitted into evidence, to show factual issues as to whether the government first proposed illegal activity and whether Diggs was initially reluctant to engage in such activity. The

record, however, discloses numerous incidents which show Diggs to have engaged in conscious deception and fraud before the agents ever came on the scene.[9] Indeed, at the time the alleged entrapment of appellants occurred, the agents were totally unaware of the acts that formed the substantive basis for the indictment. The record supports the trial judge's determination that, as a matter of law, Diggs did not adduce sufficient evidence to support his theory of entrapment.

Neither Diggs nor Oliverez raised any factual issues relating to their respective entrapment defenses. Accordingly, the district court properly refused to allow the jury to consider those defenses.

## VII

In post-trial proceedings, Oliverez moved for a new trial pursuant to Fed.R.Crim.P. 33. The basis of the motion was an affidavit by Diggs to the effect that Oliverez did not knowingly participate in any illegal activities, but merely took orders and instructions from Diggs.

A defendant who moves for a new trial because of newly discovered evidence must meet all of the requirements of Rule 33:

(1) It must appear from the motion that the evidence relied on is, in fact, newly discovered, i. e., discovered after the trial; (2) the motion must allege facts from which the court may infer diligence on the part of the movant; (3) the evidence relied on must not be merely cumulative or impeaching; (4) must be material to the issues involved; and (5) must be such as, on a new trial, would probably produce an acquittal.

*See, e. g., United States v. Krasny*, 607 F.2d 840 (9th Cir. 1979), *cert. denied*, 445 U.S. 942, 100 S.Ct. 1337, 63 L.Ed.2d 775 (1980); *United States v. Cervantes*, 542 F.2d 773,

---

7. The *Reynoso* panel also noted that it could find no case in which an entrapment defense was successfully raised without a showing of the defendant's initial reluctance to commit the criminal act. 548 F.2d at 1336 n.11.

8. Oliverez erroneously relies on certain actions of Miller, who was not a government agent.

9. Diggs attempts to nullify the effect of these acts by arguing that they materially differ from the acts that he committed after his encounters with the agents, which were the basis for the indictment. Diggs cites no authority in support of this distinction, and we are not persuaded by it.

779 (9th Cir. 1976). The evidence offered by Oliverez fails to satisfy requirements (1), (2), and (5).

When a defendant who has chosen not to testify subsequently comes forward to offer testimony exculpating a co-defendant, the evidence is not "newly discovered." *McAteer v. United States*, 148 F.2d 992 (5th Cir. 1945); *Coplin v. United States*, 88 F.2d 652, 665 (9th Cir.), *cert. denied*, 301 U.S. 703, 57 S.Ct. 929, 81 L.Ed. 1357 (1937); *see United States v. Jacobs*, 475 F.2d 270, 286, n.33 (2d Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 116, 131, 38 L.Ed.2d 53 (1973). Moreover, there has been no showing of diligence on the part of appellant Oliverez,[10] and appellant has made no showing that in a new trial Diggs' testimony would probably result in acquittal.

The trial judge has broad discretion to decide that new evidence is not sufficiently credible to support a motion for a new trial. *See United States v. Panza*, 612 F.2d 432, 441 (9th Cir. 1979). That discussion was not abused here.

The convictions are AFFIRMED.

10. The affidavit of Diggs' trial attorney, McCabe, indicates that neither Oliverez nor his counsel approached McCabe to discuss the possibility of Diggs' testifying on Oliverez' behalf.