UNITED STATES of America,
Plaintiff/Appellee.

v.

James H. PRICE, Defendant/Appellant.

UNITED STATES of America,
Plaintiff/Appellee,

v.

Joan R. PRICE, Defendant/Appellant.

Nos. 79–1112, 79–1113.

United States Court of Appeals,
Ninth Circuit.

June 9, 1980.

Rehearing Denied Aug. 4, 1980.

Craig E. Fenech, Federal Defenders of San Diego, James A. Hutchens, San Diego, Cal., for defendant/appellant.

Judith S. Feigin, Asst. U.S. Atty. (on the brief), Michael H. Walsh, U.S. Atty., Herbert B. Hoffman, Asst. U.S. Atty. (argued), San Diego, Cal., for plaintiff-appellee.

Before KENNEDY and TANG, Circuit Judges, and CURTIS,* District Judge.

TANG, Circuit Judge:

The defendants each appeal their convictions of interstate transportation of money obtained by fraud, conspiracy to commit mail fraud and two counts of mail fraud. The judgments were entered following a jury trial in district court.

Mr. Price argues (1) that there was insufficient evidence to sustain the convictions, and (2) based upon comments made by the trial judge during trial, that he was deprived of a fair trial. Mrs. Price also argues that the evidence was insufficient to sustain the convictions, and that certain of the trial court's instructions constituted reversible error.

Because we find the evidence insufficient to support a jury's conclusion that Mrs. Price was cognizant of any fraudulent aspects of the business, we reverse her convictions on all four counts. We affirm Mr. Price's convictions.

*Facts*

The government introduced evidence at trial that in the fall of 1976, Mr. Price organized Marketing Institute of America (hereafter MIA), a Virginia based corporation. On February 1, 1977, MIA entered into a contract with Dun-Hot, Inc., a Michigan popcorn machine manufacturer, whereby MIA as an independent contractor obtained the exclusive right to market Dun-Hot popcorn poppers and popcorn at busi-

---

* Honorable Jesse W. Curtis, Senior United States District Judge for the District of Central California, sitting by designation.

ness opportunity shows throughout 46 states, Florida not included.

Pursuant to this contract, Mr. Price or MIA employees would go to business opportunity shows to make presentations to potential customers and to solicit orders for Dun-Hot products.

Beginning June 9, 1977, Dun-Hot began to receive complaints from MIA customers that orders had not been filled, as well as "insufficient funds" checks from MIA. On August 18, 1977 and October 27, 1977, Dun-Hot threatened to cancel their contract with MIA[1] and did so finally on December 28, 1977. This cancellation, stating that Dun-Hot would fill no MIA orders written after January 2, 1978 and that February 1, 1978 would be Dun-Hot's final delivery date, was received at MIA's Virginia office on January 11 or 13, 1978.

Despite this contract cancellation, MIA continued to solicit and accept orders for Dun-Hot products. Following a January 7, 1978 presentation by MIA employee Richard Flock in San Diego, Clifford Monzeglio on January 20, 1978 ordered poppers and popcorn, giving Flock a $6,980 cashiers check. Mr. Monzeglio subsequently received several communications from MIA, including an introductory "welcome aboard" letter with a copy of the purchase order, and later a letter stating that there had been a delay in shipping due to bad

weather. Both of these letters were signed by Mr. Price. No delivery or refund was ever made to Mr. Monzeglio and in July, 1978 he received notice of MIA's bankruptcy proceedings.

Mr. Price and representatives of MIA continued to sell Dun-Hot products in February and March of 1978 in Texas, California and Florida. None of these poppers was delivered to the buyers and none of their money was refunded. In some cases, Mrs. Price answered phone calls from disgruntled customers. She untruthfully stated that the delay was due to bad weather or that the orders had been placed with Dun-Hot. In February 1978, Mr. and Mrs. Price together composed and sent a letter to customers stating that delays were due to the bad weather.[2]

Mrs. Price's involvement with MIA was much less pervasive than was Mr. Price's. She began working for MIA in January 1978 after Nancy Gillette ended her employment as MIA's secretary.[3] During January through March, Mrs. Price worked approximately three days per week for MIA doing general office work. At this time, she was 37 years old and had completed nine years of formal education. Prior to beginning work for MIA, she had in 1977 worked as a waitress until September when she and a friend began working as dress-

---

1. On August 18, 1977, Dun-Hot wrote Mr. Price the following letter:

 "As of this date, you do not represent Dun-Hot, Inc., in any capacity whatsoever. We will no longer sell any of our products to you or any of your various companies. You are not to sell any of our products to anyone as you do not represent us."

 After a meeting between Dun-Hot representatives and Mr. Price in Michigan, Dun-Hot agreed to resume the contractual relationship if Mr. Price would settle the complaints.

 Due to the receipt of more insufficient funds checks and more complaints from customers, the president of Dun-Hot wrote Mr. Price the following letter on October 27, 1977:

 "As of this date you do not represent Dun-Hot, Inc., in any capacity whatsoever. We will no longer sell any of our products to you or any of your various companies. You are not to sell any of our products to anyone as you do not represent us".

 \* \* \* \* \* \*
 We will honor any orders that have been written on or before November 1, 1977, but will not honor any orders not written on or before this date.

 Following receipt of this letter, Mr. Price again went to Michigan to meet with Dun-Hot representatives. In return for Mr. Price's agreement to certain conditions, Dun-Hot once again reinstated the contract.

2. In March 1978, Blanton Massey, the attorney for MIA, wrote to most of the customers stating that MIA was having contractual difficulties with Dun-Hot. Mr. Massey later advised Mr. Price that Dun-Hot was in violation of their contract with MIA, and MIA could therefore continue to sell poppers.

3. Nancy Gillette testified that she did general office work for MIA consisting of typing, filing, and depositing checks.

makers.[4] MIA's attorney, Blanton Massey, testified that Mrs. Price was not aware of MIA's business matters.[5]

## I.

### Sufficiency of the Evidence to Support the Convictions of Mrs. Price

Mrs. Price argues that the evidence is insufficient to support a jury determination that she acted with intent to defraud MIA's customers. She argues that she lacked sophistication in business matters, and the fact that she knew of certain day-to-day problems that MIA was having with its checking account and meeting customer demands does not establish the intent or knowledge required by the mail fraud statute.

In considering this argument we must view the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to sustain the government. *Glasser v. U. S.*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *U. S. v. Beecroft*, 608 F.2d 753, 756 (9th Cir. 1979). Once the facts are ascertained, the test for sufficiency of the evidence is whether the jurors reasonably could decide that they would not hesitate to act in their own serious affairs upon factual assumptions as probable as the conclusion that the defendant is guilty as charged. *U. S. v. Anderson*, 532 F.2d 1218, 1223 (9th Cir.), *cert. denied*, 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107 (1976).[6] In order to sustain a conviction, there must be relevant evidence from which the jury could reasonably find the defendant guilty beyond a reasonable doubt. *U. S. v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977); *U. S. v. Figueroa-Paz*, 468 F.2d 1055, 1058 (9th Cir. 1972).

The government urges that the evidence establishes that Mrs. Price took an active part in perpetrating a fraudulent scheme. In support of this, the government states that the jury's disbelief of Mrs. Price's testimony provides a partial basis for a conclusion that the opposite of that testimony is true. While it is well settled that disbelief of a defendant's own testimony may help to establish that the opposite is true, such disbelief can provide only partial support; there must be "other objective evidence on the record which buttresses the fact finder's drawing of the opposite inference." *U. S. v. Martinez*, 514 F.2d 334, 341 (9th Cir. 1975); *U. S. v. Chase*, 503 F.2d 571, 473 n.4 (9th Cir. 1974), *cert. denied*, 420 U.S. 948, 95 S.Ct. 1332, 43 L.Ed.2d 427 (1975). Where the only basis for a finding contrary to the testimony of a witness is his demeanor, however, a conviction will not be sustained. *Chase, id.* at 573 n.4.

In order to sustain a conviction under the federal mail fraud statutes, it is not necessary that the defendant be the mastermind of the operation, but it is necessary to show willful participation in a scheme with knowledge of its fraudulent nature and with intent that these illicit objectives be achieved. *See U. S. v. Beecroft*, 608 F.2d at 757; *U. S. v. Pearlstein*, 576 F.2d 531, 537 (3d Cir. 1978). Participation in furtherance of a fraudulent scheme does not, by itself, justify a conviction unless the defendant's knowledge of the fraudulent purpose can be shown. *Pearlstein, id.* at 538; *U. S. v. Klein*, 515 F.2d 751, 754 (3d Cir. 1975).

In the instant case, the government established that Mrs. Price was involved for only three months with the MIA business; she answered the phone, wrote checks and took care of some bookkeeping. She also

4. Mrs. Price testified that in September 1977 "My girlfriend and I worked together at her home and we made clothes for people and had a fashion show and sewed for people, fitted them personally."

5. Mr. Massey testified, "I had sufficient conversations with Mrs. Price to know, since I did know more about the business as the advisor to Mr. Price, that she [Mrs. Price] was not aware of the business matters."

6. The tests applied by the trial judge to a motion for judgment of acquittal under Rule 29(a) Fed.R.Crim.P., and by a reviewing court to his ruling thereon, are substantially identical. *U. S. v. Anderson*, 532 F.2d 1218, 1233 (9th Cir. 1976).

wrote, knowing its contents to be untrue, a letter to customers telling them that the delays were due to bad weather. Mrs. Price took the stand in her own behalf, testifying that she did not involve herself in the business matters of MIA and that the purpose of the bad weather letter was "to try the have enough time to get the machines . . . ." She denied ever having an intent to defraud or any knowledge of the fraudulent character of the business.

Given Mrs. Price's minimal involvement in MIA matters, her short time working with the company, the lack of direct evidence of intent or knowledge, and her lack of business experience or higher education, we do not find the necessary relevant evidence from which a jury could reasonably find Mrs. Price guilty beyond a reasonable doubt. The jury's evaluation of her demeanor on the stand, without more, cannot support her convictions.

 While awareness of a high probability of fraud, coupled with shutting one's eyes to avoid learning the truth, may in some instances support a conviction of mail fraud, see *U. S. v. McDonald*, 576 F.2d 1350, 1358 (9th Cir.), *cert. denied*, 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978), Mrs. Price's "mere 'involvement in an unsavory, fly-by-night scheme' is not sufficient to establish knowing participation in a scheme to defraud." *U. S. v. McDonald, id.* at 1359. *U. S. v. v. Piepgrass*, 425 F.2d 194, 199 (9th Cir. 1970). We cannot infer from this little evidence in the record that Mrs. Price had "the intent to defraud 'because the logical relationship between what (s)he *could have* known and a specific intent has no rational basis.'" *U. S. v. McDonald*, 576 F.2d at 1359. *U. S. v. Peipgrass*, 425 F.2d at 199–200 (emphasis in original). See also *U. S. v. Farris*, 614 F.2d 634 (9th Cir. 1979). We accordingly reverse Mrs. Price's convictions on all four counts.[7]

**7.** Because we have reversed Mrs. Price's convictions based upon the insufficiency of the evidence, we find it unnecessary to address her argument that certain of the jury instructions constituted reversible error.

## II.

### *Trial Court's Comments*

Mr. Price argues that two comments made by the trial judge deprived him of a fair and impartial trial.[8] Bill Dickerson, a defense witness, testified that he grossed $20,000 during the three and one-half months that he worked for MIA, and the he had expenses of $8,000. The trial court then stated:

"THE COURT: Like flying your airplane?

"THE WITNESS: No, I didn't have the airplane then because the one we're talking about—in fact, I flew up to Albany, New York on a bi-plane, two wing cockpit but the Debonnaire, the one I had, was being reworked at the time and I was utilizing commercial aviation.

James argues that the trial court's comment constituted an unwarranted display of disbelief of the defense witness.

The other comment upon which Mr. Price bases his argument occurred earlier in the trial during the cross-examination by defense counsel of a bank employee, Denise Novinger.

"DEFENSE COUNSEL: Normally when people are going to kite checks, they don't write them to themselves from their own accounts, do they?

THE WITNESS: No, not in the same bank. This is not normal.

THE COURT: It's a naive way of kiting.

DEFENSE COUNSEL: It doesn't effect the same purpose, your Honor.

THE WITNESS: You're robbing Peter to pay Paul, basically.

DEFENSE COUNSEL: You don't gain anything by writing a check to yourself and bouncing it, do you?

THE WITNESS: No sir.

 A federal judge has the right and the duty to facilitate the orderly progress of a trial by direct participation.

**8.** A motion for mistrial based upon these comments was made and denied.

Questions which aid in clarifying testimony of a witness, expedite examination or confine it to relevant matters are proper if made in a nonprejudicial manner. *U. S. v. Pena-Garcia*, 505 F.2d 964, 967 (9th Cir. 1974). While the clarification of testimony is proper, the trial court must avoid any appearance of partiality or hostility toward one side. *Rogers v. U. S.*, 609 F.2d 1315, 1318 (9th Cir. 1979).

While we do not approve of the trial court's interventions in the instant case, a careful examination of the comments discloses no prejudice to the defendant. In light of the strong evidence of Mr. Price's guilt and two cautionary instructions given by the trial court, we find no reversible error.

### III.

*Sufficiency of the Evidence to Support the Convictions of Mr. Price*

Mr. Price argues that while untruthful, the bad weather letter was innocent, and that neither it nor the "welcome aboard" letter was written with an intent to defraud. Alternatively, he contends that these letters were sent after the money had been collected from the customers, and were therefore no part of any scheme to defraud.

The evidence in the record establishes that Mr. Price was actively involved with MIA business matters from its inception, and not merely an uninformed investor or employee. A jury could have reasonably concluded from this involvement and from (1) MIA's solicitation of orders after Dun-Hot had cancelled its contract and in a state for which it had no contract, (2) the use of fabricated excuses and "lulling" letters, and (3) the use of misleading statements in its promotional material, that Mr. Price acted with knowledge and with intent to defraud. *See e. g. U. S. v. Pearlstein*, 576 F.2d at 537. We thus find the evidence sufficient for the jury to conclude that Mr. Price possessed the requisite knowledge and intent to defraud.

Mr. Price urges that even assuming the evidence is sufficient to establish knowledge and intent, the letters were not sufficiently connected with the scheme in order to constitute mail fraud. The mail fraud statute makes criminal only those mailings which are made for the purpose of executing the fraudulent scheme. *Kann v. U. S.*, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944). In each case, the question is whether or not the mailings were sufficiently closely related to the defendant's scheme to bring his conduct within the statute. *See U. S. v. Maze*, 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974).

The Supreme Court has held when the scheme to defraud is concluded prior to the mailing, no mail fraud results. *Kann v. U. S.*, 323 U.S. at 94, 65 S.Ct. at 150; *Parr v. U. S.*, 363 U.S. 370, 383, 80 S.Ct. 1171, 1179, 4 L.Ed.2d 1277 (1960). There is no hard and fast rule, however, and if the purpose of otherwise routine mailings is to execute the scheme by a calculated attempt to lull victims into inaction, mail fraud will result. *U. S. v. Sampson*, 371 U.S. 75, 81, 83 S.Ct. 173, 176, 9 L.Ed.2d 136 (1962).

In the instant case, the jury may have reasonably concluded that the untruthful letter stating that delays were due to bad weather was contemplated by Mr. Price to lull his customers into inaction and to postpone detection of his scheme. We thus find the evidence sufficient to sustain this conviction. Because Mr. Price received concurrent sentences on all four counts for which he was convicted, we are not required to consider challenges to the remaining counts. *U. S. v. Monroe*, 552 F.2d 860, 865 (9th Cir.), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1009 (1977).

Mrs. Price's convictions are reversed. Mr. Price's convictions are affirmed.