833 F.2d 1014
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert W. BUSSE, George R. Dey, Aurel P. Lupulescu, and
Franklin J. Failla, Defendants-Appellants.
 Nos. 85-1919, 1957, 1958, 1961, 1962 and 1971.
 United States Court of Appeals, Sixth Circuit.
 Nov. 24, 1987.
 
 Before LIVELY, Chief Judge, BOGGS, Circuit Judge, and CELEBREZZE, Senior Circuit Judge.
 CELEBREZZE, Senior Circuit Judge.
 
 
 1
 Defendants Robert W. Busse, D.C., George R. Dey, D.C., Aurel P. Lupulescu, M.D., and Franklin J. Failla appeal their jury convictions on multiple counts of mail fraud and aiding and abetting, see 18 U.S.C. Secs. 1341, 2 (1982), for their participation in a scheme to generate fraudulent billings to Blue Cross and Blue Shield of Michigan ("BCBSM") from five medical/chiropractic health clinics in the Detroit area. Appellants contend that the district court erred in denying pretrial motions and in admitting certain evidence, and that insufficient evidence was introduced at trial to prove their knowing and willful participation in the scheme. We conclude that the evidence was sufficient to support the jury's verdicts, and that the district court did not otherwise err. Accordingly, we affirm.
 
 
 2
 Viewing the evidence adduced at trial in the light most favorable to the government, as we must, Glasser v. United States, 315 U.S. 60, 80 (1942), it is indisputable that the clinics were created for the primary purpose of generating fraudulent billings to BCBSM. The businessperson defendants, of whom only defendant Failla is on appeal, operated the clinics under the corporate names LMR Corp. ("LMR"), J.R. Enterprises ("J.R."), and Franklin Management Co. LMR was in charge of the operation, having responsibility for organizing the clinics, operating the medical "sides," and billing the various private insurers, including BCBSM. Franklin Management, which was owned by appellant Failla, and J.R. were primarily responsible for running the chiropractic "sides" of the clinics. The chiropractic side was always manned by a licensed chiropractor, while a medical doctor or osteopath was present on the medical side only one day per week.
 
 
 3
 The success of the scheme to defraud depended on the ability of the clinics to process a large number of "patients," ninety percent of whom were BCBSM subscribers, and to bill BCBSM for the services rendered. To assure the necessary volume, the clinics made cash payments that ranged from $20 to $50. This payment was initially made directly to each new patient, but after a brief time, ostensibly on the advice of counsel, the clinics began making the payment to the individual who referred the patient to the clinic, i.e., the "referee," who would in turn divide the cash with the patient. Patients were also routinely furnished with "work excuse slips" that would be signed by the chiropractor on duty and would excuse the patient from work for a stated period of time.
 
 
 4
 Although these incentives were necessary to bring patients into the clinics, the payment of referral fees to the referees enabled the fraudulent scheme to flourish. The referees additionally received bonuses of $50 or $100 for referring ten or more patients to the clinics in a given week. This system motivated the referees to search out BCBSM subscribers to attend the clinics, and it resulted in a cadre of "professional" referees supporting the clinics. Several clinic employees similarly received a $5 per patient cash "efficiency bonus," but the referees and the staff would receive payment only if the patient underwent medical testing, including multiple blood tests. The referees and the clinic staff, therefore, coached patients to make proper chiropractic complaints in order to receive x-rays and a work excuse slip, and to make appropriate medical complaints so blood tests would be performed and cash payments received. If a patient was unable to give the amount of blood necessary for testing, the referee would often substitute his own blood so that payment would be received.
 
 
 5
 Despite the fact that this cash payment system was integral to the success of the clinics, the schemers took great pains to hide the payments from persons outside the clinics, including their attorney, and from some of their own staff, including appellant Dr. Lupulescu. The clinic staff was told not to discuss the payments with outsiders, and the payments themselves were made in a covert fashion. The principals of LMR would draw cash on a daily basis from an account entitled "Commissions," and the cash would be given to the receptionist who would then pay the referees. No records of these cash transactions were maintained, and they were not reported by LMR for tax purposes.
 
 
 6
 In contrast, the schemers kept meticulous records that, they contended at trial, "proved" the legitimacy of the operation from a medical or chiropractic standpoint. They required that each patient have his photograph and thumbprint taken, and that each patient sign a notarized affidavit stating that the complaints made were true. The evidence indicated, however, that patients weren't required to read the affidavit before signing. The defendants were also careful to obtain opinions from attorneys concerning the legality of their operation, although in each instance they failed to disclose fully to the attorney how the clinics were actually run. The record supported the conclusion that the defendants created this "paper trail" to hide their fraud, not to dissuade fraudulent patients.
 
 
 7
 Once these formalities were discharged, the patients were processed through the clinics in a regular manner. The patient first gave some personal information and "complaints" to the receptionist. Second, the patient was seen by the chiropractor, who examined the patient and ordered a standardized battery of chiropractic x-rays. The chiropractor then "referred" the patient to the medical side of the clinic, knowing that no medical doctor would be present. Instead, a medical assistant took the patient's medical history and recorded the patient's medical "complaints." Based upon these inquiries, and in conjunction with appellant Dr. Lupulescu's standing medical orders ("SMO"), the medical assistant would order medical tests, usually EKG, PFT, ultrasound, blood tests, and urinalysis. Most of these tests were conducted at the clinics, except for the blood tests and urinalysis, which were done at private laboratories. BCBSM was then billed for the x-rays and tests.
 
 
 8
 Dr. Lupulescu's SMO, the linchpin of the fraudulent scheme, was a check-list form that purported to correlate the patient's medical history and subjective complaints, and then to dictate what tests should be ordered based on those data. The defendants contended throughout trial that the SMO, when properly used, was self-executing and left no discretion in the medical assistants. The evidence disclosed, however, that the medical assistants were not well-trained personnel. Only one, Nancy Hefferon, had previous experience, and she was the only one trained in using the SMO by Dr. Lupulescu. Ms. Hefferon was charged with training the others, whose experience then came on the job. The evidence suggested that Ms. Hefferon trained medical assistants to order tests without reference to the SMO. In addition, when inquiring into subjective complaints, the assistants were instructed not to limit their questions to the patient's present ailments. For example, the medical assistant might inquire whether the patient "ever" had headaches, and the predictable answer to such an open-ended question inevitably increased the "need" for medical testing. Finally, the medical assistants sometimes prepared patient order forms at home for overtime pay, leaving only the patient's personal information to be completed at the clinic. These procedures, in conjunction with the medical assistants' complicity in ensuring that blood tests would be performed so that cash payments could be received, resulted in a standardized medical testing.
 
 
 9
 The record amply supported the government's theory that the defendants intended to defraud BCBSM by billing for services that were rendered at the clinics in derogation of the BCBSM rules that benefits would be paid only for "necessary services" and only if those services were performed in the provider's "presence." The term "necessary services" was defined in the indictment in the language of the BCBSM Physician's Manual:
 
 
 10
 Except as limited or excluded, payment for services rendered by a physician in the diagnosis or treatment of disease or injury will be paid.
 
 
 11
 ....
 
 
 12
 Services not required in and directly related to ... diagnosis or treatment of illness and injury are excluded as benefits, such as, examination and tests in connection with research studies; screening procedures; routine or periodic physical examinations; and pre-marital or pre-employment, or sports examinations.
 
 
 13
 The regular fabrication of complaints and the standardized testing that resulted was strong evidence that the defendants were not billing BCBSM for "necessary services," but were billing for mere "screening procedures." Similarly, each provider signs an agreement with BCBSM, which states:
 
 
 14
 The provider certifies that all claims to be submitted by means of the equipment shall be for services performed personally or under provider's direct and personal supervision and in provider's presence ...
 
 
 15
 Although the jury was apprised that this provision cannot be taken literally, e.g., a physician may bill for x-rays even though he was not physically present when they were taken and developed, the complete delegation of authority to order medical tests, as that practice evolved at these five clinics, revealed that the schemers were billing BCBSM without regard for the "presence" provision. All but one of the defendants was convicted and sentenced, and this timely appeal by four of the defendants ensued.
 
 I.
 
 16
 Drs. Busse, Dey, and Lupulescu contend on appeal that even assuming the existence of the fraudulent scheme, the evidence was insufficient to prove their knowing and willful participation in it. They thus contend, as they did before the jury, that they discharged their medical or chiropractic duties in a professional manner, and that they believed in good faith that their billings to BCBSM were in compliance with all requirements.
 
 
 17
 The federal mail fraud statute proscribes any individual from devising or intending to devise a scheme to defraud and then using the mail system or causing the mails to be used "for the purpose of executing such scheme." 18 U.S.C. Sec. 1341 (1982); see Pereira v. United States, 347 U.S. 1, 8 (1954); United States v. Stull, 743 F.2d 439, 442-43 (6th Cir.1984). Since mail fraud is a specific intent crime, Stull, 743 F.2d at 442; United States v. Valvanis, 689 F.2d 626, 627 (6th Cir.1982); United States v. Goss, 650 F.2d 1336, 1341 (5th Cir.1981), the defendant's good faith is a complete defense to the charge, Goss, 650 F.2d at 1344-45. In addition, the defendant's use of the mails may be found criminal only if it is "in furtherance of" the illicit scheme. Kahn v. United States, 323 U.S. 88, 93-95 (1944); United States v. Price, 623 F.2d 587, 593 (9th Cir.1980).
 
 
 18
 When the defendants are also charged as aiders and abettors under 18 U.S.C. Sec. 2 (1982), the government must prove "two prongs--association and participation." United States v. Beck, 615 F.2d 441, 448-49 (6th Cir.1980). Under the association prong, the prosecution must show that the defendant shares the criminal intent required under the substantive statutory offense. Id.; United States v. Bryant, 461 F.2d 912, 920-21 (6th Cir.1972) (defendant must intend to help the criminal venture succeed). When this criminal intent is coupled with an affirmative act designed to further the criminal venture, i.e., the participation prong, the offense of aiding and abetting is made out. Beck, 615 F.2d at 448-49. In the mail fraud context, the government must prove beyond a reasonable doubt that the defendant associated himself with the illicit scheme, that he participated in it, and that he sought by his participation to make the scheme succeed. See Nye & Nissen v. United States, 336 U.S. 613, 619 (1949); United States v. Zackert, 783 F.2d 677, 678 (6th Cir.1986) (per curiam); United States v. Elkins, 732 F.2d 1280, 1287 (6th Cir.1984); United States v. Peoni, 100 F.2d 401, 402 (2d Cir.1938) (L. Hand, J.).
 
 
 19
 We finally note our limited scope of review in appeals challenging the sufficiency of the evidence. We view the evidence in the light most favorable to the government and give "full play to the jury's right to determine credibility, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts." Stull, 743 F.2d at 442; United States v. Winston, 687 F.2d 832, 835 (6th Cir.1982). We will then uphold the convictions if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); Stull, 743 F.2d at 442. With these principles in mind, we consider the appellants' challenges to their convictions.
 
 A.
 
 20
 Robert W. Busse, D.C.
 
 
 21
 Defendant Busse is a chiropractor who was employed at several of the clinics. He later became the director of chiropractic at the clinics, which required that he hire other chiropractors to work at the clinics under his direction. The chiropractors who worked for Dr. Busse billed BCBSM through Dr. Busse's provider number. Dr. Busse was charged under 78 counts of the indictment, but was only convicted on six counts. Those six counts represented checks issued by BCBSM directly to Dr. Busse for chiropractic services performed by him or one of his chiropractors at the clinics. He was sentenced to six concurrent three-year prison terms and fined $6,000.
 
 
 22
 The evidence contradicts Dr. Busse's assertion on appeal that he did not knowingly participate in the scheme with intent to commit fraud. Government witness John Howze, one of the more prolific referees at the clinics, identified Dr. Busse as the individual who spoke at a gathering of referees and clinic employees at the Pontchartrain Hotel in March, 1981. Howze testified that Dr. Busse told those present that the "patients" must vary their complaints, and that Dr. Busse then instructed the referees on what ailments the patients should describe to the clinic personnel to have chiropractic x-rays taken. A chiropractor hired by Dr. Busse to work at one of the clinics further testified that Dr. Busse ordered the chiropractors to take an excessive amount of chiropractic x-rays of each patient, and that Dr. Busse attempted to institute a policy requiring each patient to be re-x-rayed after 30 days. Finally, in August of 1981, BCBSM put Dr. Busse on "prepayment review" of his billings, which meant he no longer could bill through the computer, but was required to bill by "hard copy" so that BCBSM could individually review his billings to identify possible irregularities. Dr. Busse evaded this review by billing for his services under another chiropractor's provider number. This evidence clearly supported the jury's requisite conclusion that Dr. Busse knowingly participated in the fraud with the intent to make the scheme succeed.
 
 
 23
 Furthermore, we reject Dr. Busse's contention that he cannot be held criminally liable on the six counts because he did not personally perform the chiropractic services in question, and because the government failed to prove that those services were fraudulent. Of course, the government need not show that each use of the mails is fraudulent, see, e.g., Valvanis, 689 F.2d at 628; United States v. Lichota, 351 F.2d 81, 89 (6th Cir.1965), cert. denied, 382 U.S. 1027 (1966), but must show that each use of the mails is "in furtherance" of the scheme to defraud. This requirement is met in the instant case because the entire objective of the scheme was to generate payments from BCBSM. Moreover, Dr. Busse's actions at the hotel meeting and in ordering his chiropractors to take unnecessary x-rays clearly established his "participation" in the scheme. Having been instrumental in instructing the referees on how to coach the patients to complain, Dr. Busse's reliance on the patients' subjective complaints to justify the billings from a chiropractic standpoint is not credible. Dr. Busse's final contention that he personally had to perform the chiropractic services to be convicted for the mailing of the six checks to him is equally unpersuasive. He cannot now hide behind the unwitting participation of the chiropractors under his charge, who may well have thought that they were performing necessary services. The evidence showed that Dr. Busse knew otherwise, yet he stayed with the clinics, became the director of chiropractic, and permitted the chiropractors to bill BCBSM under his provider number. Dr. Busse, therefore, was properly convicted as an aider and abettor on the six counts.
 
 B.
 
 24
 George R. Dey, D.C.
 
 
 25
 Defendant Dey is a chiropractor who was employed at the first of the five clinics for ten months in 1980. Dr. Dey was convicted on five of the twenty-five counts in which he was charged. Again, these five counts corresponded to five checks issued by BCBSM for chiropractic services performed by Dr. Dey. The district court sentenced Dr. Dey to five concurrent eighteen-month terms and fined him $5,000.
 
 
 26
 Dr. Dey also complains that the government did not prove that the services given to any of the five patients under scrutiny were chiropractically unnecessary. We again note that the propriety of the convictions does not hinge on the finding that each billing to BCBSM was fraudulent. Cf. Valvanis, 689 F.2d at 628. Moreover, Dr. Dey's "participation" in the scheme cannot be doubted: he worked at the clinics, supposedly examined patients, and billed BCBSM for his services. The only question, therefore, is whether the evidence supports the jury's conclusion that Dr. Dey possessed the requisite criminal intent.
 
 
 27
 Viewing the evidence in its entirety, the jury was entitled to conclude that Dr. Dey shared the criminal intent necessary for conviction. The testimony of BCBSM investigator William Huston, who went into the clinic "under cover," contradicted Dr. Dey's asserted lack of knowledge and fraudulent intent. Dr. Dey could find nothing wrong with him, but nonetheless invited Huston back the next day for a series of x-rays and lab tests, telling him not to worry because BCBSM would pay the bill. Without the patient first seeing Dr. Dey again the next morning, the x-rays were taken and medical lab tests performed. Huston was subsequently given two work excuse slips, even though Dr. Dey never found anything wrong with him. Two of the other "patients" treated by Dr. Dey similarly testified that they went to the clinics to receive money, and that they were given many tests, including x-rays, without making any present complaint. An exhibit prepared by Dr. Dey from a random sample of the 2200 patients that he treated indicated that Dr. Dey always ordered the same four sets of chiropractic x-rays, even though there were ten to twelve possibilities. Indeed, the five counts on which he was convicted were for the mailings of BCBSM checks that resulted when Dr. Dey ordered the same four series of chiropractic x-rays. Dr. Dey's assertion that the procedures were chiropractically necessary, therefore, was quite suspect.
 
 
 28
 His assertion of no criminal intent was further jeopardized when he admitted knowing that medical tests were being ordered without the presence of a physician. Although Dr. Dey denied ordering any medical x-rays or tests, investigator Huston had testified that Dr. Dey invited him to the clinic the second day for x-rays and medical lab tests, which were then performed on Huston. On cross-examination it also became apparent that many of Dr. Dey's own chiropractic charts from the clinic contained the records of medical x-rays, which he was admittedly incompetent to order. In addition, although Dr. Dey attempted to portray himself as one who ferreted out fraud, he was shown to have billed BCBSM for the "treatment" of at least six referees who had referred patients that Dr. Dey suspected of being fraudulent. Dr. Dey's charts of those six individuals revealed that improper medical x-rays were recorded, and that several of them received work excuse slips for extended periods of time.
 
 
 29
 These considerations lead us to conclude that the jury could properly find Dr. Dey's asserted lack of knowledge and criminal intent unbelievable, and that the jury could rely on his lack of candor in assessing his guilt. Cf. United States v. Price, 623 F.2d 587, 591 (9th Cir.1980) (jury's disbelief of defendant's testimony may support finding of guilt if other evidence in record buttresses such a finding). Accordingly, we hold that sufficient evidence existed from which the jury could find beyond a reasonable doubt that Dr. Dey knowingly participated in the scheme with the intent to defraud BCBSM.
 
 C.
 
 30
 Aurel P. Lupulescu, M.D.
 
 
 31
 Defendant Lupulescu is a medical doctor who worked at several of the clinics. He was involved in the clinics from their inception and spent a considerable amount of time at the first clinic during its initial months of operation. As the other clinics opened, however, Dr. Lupulescu would spend only one afternoon per week in each clinic, seeing only return patients. As described above, the new patients were routinely interviewed by the medical assistants who would then order medical tests in conjunction with Dr. Lupulescu's standing medical orders ("SMO"). Dr. Lupulescu's involvement with the clinics terminated in August, 1982. He was indicted on 68 counts and was convicted on 48. Dr. Lupulescu was sentenced to fifteen concurrent four-year prison terms and fined $6,000.
 
 
 32
 On appeal, Dr. Lupulescu argues that the government failed to prove that he possessed the intent to defraud necessary to convict him as an aider and abettor to the scheme to defraud. We first note that Dr. Lupulescu's "participation" in the scheme was crucial to its success. The large number of medical tests originating at the clinics were made to appear necessary only through the use of Dr. Lupulescu's SMO. This extensive participation standing alone, however, would not be sufficient to support the jury's guilty verdicts. We therefore turn to the evidence to see whether it supports the jury's conclusion that Dr. Lupulescu shared in the schemers' fraudulent intent.
 
 
 33
 Dr. Lupulescu contends that the use of his SMO by the medical assistants was a good faith attempt to comply with his obligations to BCBSM. Dr. Lupulescu asserts, as he did before the jury, that the use of the SMO was in compliance with the "necessary services" and "presence" provisions because he created the SMO, assured himself that the medical assistants were using them properly, and reviewed each case to determine whether the tests ordered were consistent with the patient's complaints and medical history.
 
 
 34
 The evidence at trial, however, entitled the jury to draw a very different picture of the use of the SMO and Dr. Lupulescu's involvement. Most suspect is his assertion that he assured himself that the medical assistants were properly using the SMO. The testimony showed that the SMO contained difficult medical terminology and that the method of questioning necessary to apply the SMO properly was quite complex. Yet Dr. Lupulescu only trained one of the medical assistants, Ms. Hefferon, on the proper use of the SMO, leaving her to instruct the rest. As mentioned above, the training Ms. Hefferon gave the others was woefully inadequate. Dr. Lupulescu asserted that he was unaware of these problems even though the testimony indicated that they were pervasive. He testified that he was always available by telephone to clarify the SMO, but that, despite the complexity of the task, only one medical assistant ever needed such help. There is nothing in the evidence to suggest that Dr. Lupulescu provided any meaningful supervision over the medical assistants' procedures in taking medical histories or questioning patients about medical complaints. Instead, the record firmly supports the conclusion that Dr. Lupulescu merely assumed that the SMO was being properly utilized. When juxtaposed with Dr. Lupulescu's assertion that he assured himself of the proper use of the SMO, this evidence undermined his good faith defense.
 
 
 35
 Moreover, there was additional evidence from which the jury could conclude that such a delegation of authority to unsupervised personnel was inconsistent with BCBSM requirements. Although several witnesses testified that the SMO is sometimes used in hospitals or clinics, none represented that the practice followed under Dr. Lupulescu's SMO, in which every new patient was interviewed and medical tests were ordered without a medical doctor's participation, was usual or standard. The testimony indicated that the process of taking a medical history and inquiring into subjective complaints is anything but mechanical. Indeed, medical students are specifically trained, according to the testimony, in how to conduct such inquiries to discover all the relevant information and discard the irrelevant. Given this testimony, the jury was not required to believe the defendants' contention that the SMO left the medical assistants with no discretion. Rather, the combination of little training and no supervision suggests that medical assistants had much discretion in interviewing patients and filling out the SMO.
 
 
 36
 Dr. Lupulescu's own testimony further undermined his good faith defense and supported the conclusion that he was aware of the impropriety of this delegation of his medical function. Dr. Lupulescu testified on direct examination concerning how he used his SMO:
 
 
 37
 Q: And then, since you were on the premises, what would you do in connection with the medical history and the guidelines [SMO], if anything?
 
 
 38
 A: I did exactly as every hospital. The patient came to me, I talked to him about his complaint. I examined the patient clinically, by auscultation, palpitation, and reflexes, and then I recommended [tests], according to the profile [SMO], and I made an appointment for him to come when the tests were performed.
 
 
 39
 Trans. vol. XVI, 2713. Thus, although a doctor must by necessity rely greatly on the patient's verbal complaints, Dr. Lupulescu stated that it was necessary for him to conduct a clinical examination before he would order medical tests from the SMO. The record is devoid of any suggestion that the medical assistants were qualified or trained to examine patients by auscultation, palpitation, or reflexes. The record is also devoid of any explanation as to how an ill-trained medical assistant could properly order tests without these procedures, when an experienced medical doctor using the same SMO required the clinical examination first. This discrepancy is persuasive evidence that Dr. Lupulescu instituted the SMO without regard for the presence requirement under his contract with BCBSM, and that he intended this procedure to result in the performance of unnecessary medical tests. Under this view, the SMO is but another example of the "paper trail" left by the defendants in order to legitimize their massive billings to BCBSM.
 
 
 40
 Dr. Lupulescu lastly argues that he reviewed all medical tests and did not bill BCBSM for tests that were not ordered in compliance with his SMO. As the preceding discussion indicates, however, by the time the patient's "treatment" reached this stage, the damage was already done. The failure to conduct clinical examination could not be remedied at that point, and given his trusting style of "supervision," Dr. Lupulescu could hardly be confident that the check marks had been properly entered on the SMO or that the assistant had made the searching inquiries one would expect in a medical examination. The jury was not required to believe that this after-the-fact review was a good faith attempt to satisfy BCBSM requirements.
 
 
 41
 We believe that this evidence and the reasonable inferences therefrom are sufficient to support the jury's verdict. This conclusion is buttressed by Dr. Lupulescu's behavior after BCBSM put him on prepayment review in 1981. Instead of submitting his billings in the hard-copy format required under BCBSM regulations, Dr. Lupulescu arranged with another medical doctor to bill BCBSM for Dr. Lupulescu's services under the other's provider number. Such action again supports the jury's conclusion that Dr. Lupulescu intended to defraud BCBSM while working at the clinics.
 
 II.
 
 42
 Defendant Lupulescu also asserts that the district court erred in denying his motions to sever and for a bill of particulars. We have closely scrutinized the record, however, and have found no abuse of discretion in the denial of these motions. See United States v. Stull, 743 F.2d 439, 446 (6th Cir.1984) (severance); United States v. Brimley, 529 F.2d 103, 108 (6th Cir.1976) (bill of particulars). In addition, defendants Lupulescu and Failla contend that their convictions should be reversed due to evidentiary errors made by the district court. Having reviewed the record and carefully considered the parties' arguments in light of the relevant authorities, we find no reversible error in the district court's evidentiary decisions.
 
 
 43
 Accordingly, the judgments of the District Court are AFFIRMED.