In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 15-3871 & 16-1002

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LEON DINGLE, JR., and KARIN DINGLE,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Central District of Illinois.
No. 12-CR-30098 — **Richard Mills**, *Judge.*

ARGUED MARCH 29, 2017 — DECIDED JULY 5, 2017

Before WOOD, *Chief Judge*, and ROVNER and WILLIAMS, *Circuit Judges.*

WOOD, *Chief Judge*. The State of Illinois, through its Department of Public Health, furnishes funds to a variety of organizations that provide health services. Included among those grantees were the Broadcast Ministers Alliance of Chicago ("Broadcast Ministers"), Access Wellness and Racial Equity ("AWARE"), and Medical Health Association ("MHA"). Collectively these three organizations received

more than $11 million from the Department between 2004 and 2010. Unbeknownst to the Department, however, some $4.5 million of those dollars flowed through the grantees to a company called Advance Health, Social & Educational Associates ("Advance"), which was owned and controlled by Leon and Karin Dingle. That might have been fine, but for the fact that most of those monies did not go to the stated purposes of the grants. Instead, the Dingles spent the diverted funds on personal luxuries, such as yachts and vacation homes. The government eventually caught up with them and indicted them on charges of mail fraud and money laundering. A jury convicted them, and they have now appealed from both their convictions and their sentences. We find no reversible error for either defendant, and so we affirm the judgments of the district court.

# I

The state funds were designed to improve health care in a number of areas, including breast, cervical, and prostate cancer, HIV/AIDS, and emergency preparedness. In order to achieve these goals, the Department worked primarily through grantees. During the time covered by the Dingles' scheme, the Directors of the Department included Eric Whitaker and Damon Arnold. A woman named Quinshaunta Golden served for some time as chief of staff to the Director; Roxanne Jackson was a former employee of the Department and a personal friend of Golden.

Advance was a for-profit corporation with offices located in Chicago. Leon Dingle was its president, chief executive officer, treasurer, and sole shareholder. Karin Dingle served as the vice president and secretary. (In the remainder of this opinion, we refer to them by their first names.) The Dingles'

friend Jacquelyn Kilpatrick was the vice president of operations and bookkeeper. Edmond Clemons, Kilpatrick's domestic companion, helped out, and in 2009 the two established a consulting firm called Jeck Consultants, LLC.

Before 2004, Advance offered consulting services; it was involved in the development of the cable television industry in the Chicago area. Through this connection, Leon met officials from Broadcast Ministers. Acting on its behalf, he persuaded the Department to give Broadcast Ministers $1,460,000 in grants, for disbursement to groups such as the Brothers and Sisters United Against HIV/AIDS ("Brothers and Sisters") and the Faith-Based Emergency Preparedness Initiative ("Faith-Based"). The latter organizations emphasized the needs of minority communities.

Leon also had business and personal relationships with Whitaker, Golden, Arnold, Claudia Johnson, and Ronald Hickombottom. Johnson met Leon in 2003; the two later had a multi-year extra-marital sexual relationship. During that time, Johnson helped Leon in his grant-related work with Broadcast Ministers. It was Johnson who established AWARE in 2007; Hickombottom (Leon's personal physician) established MHA in 2008. Both of these organizations provided medical consulting services.

Using this web of entities, Leon and his associates caused the Department to award 42 grants, totaling more than $11 million, to Broadcast Ministers, AWARE, and MHA between 2004 and 2010. Leon had inside help: Golden, with whom Leon had at least one sexual encounter (which took place in her office!), steered grants in accordance with Leon's instructions. Although the grants nominally went to the three

named recipients, in fact they were nothing but straw grant-
ees. A substantial proportion of the funds wound up in the
hands of Leon and Advance. Leon accomplished this with, for
example, the use of phony contracts that indicated Advance
would perform services that the grantees were already
providing, false grant applications and budgets, dishonest re-
ports, and concealment of Advance's role. The record is filled
with examples of how Advance got its hands on Depart-
mental grants, and how it diverted those funds to the personal
use of Leon and Karin.

All of the grant funds were disbursed to the grantees by
the mailing of checks from the Department's Springfield of-
fices to Chicago. These funds represented approximately 88%
of Advance's income between 2007 and 2010. Leon and Karin,
and to a lesser degree Kilpatrick and Clemons, received a
large share of the grant funds, but they did little to no work
contemplated by the grants. What they did do was to write
and sign generous checks for themselves (nearly $2.5 million
payable directly to Leon and Karin, for instance). Leon and
Karin also used the funds to pay more than a half million dol-
lars in personal expenses, such as tax payments, memberships
at various yacht and country clubs, maintenance of a condo-
minium in an exclusive Chicago building, support of two va-
cation homes, and a mortgage for their son.

Although Leon appears throughout this account, that does
not mean that Karin was missing. In addition to reaping the
benefits of the fraudulent scheme, Karin was involved in its
operation, though to a lesser degree than Leon. In addition to
serving as Advance's vice president and secretary, she worked
part-time at its office. There she performed administrative

tasks, such as light typing, answering the telephone, and pay-roll. She scheduled and drafted agendas for meetings related to the grant programs. There was evidence indicating that she was aware of the shady provenance of the money that she and Leon were receiving. On one occasion she and Kilpatrick con-fronted Leon about being "greedy." Of the $2.6 million in Ad-vance checks that were issued to Leon and Karin from 2007 to 2010, $440,900 was paid directly to Karin. During that same period, she signed 915 Advance checks, totaling $1.7 million; many of those were for personal expenses.

The party ended in November 2012, when a grand jury re-turned indictments against both Dingles. Leon was charged with one count of conspiracy to commit mail fraud (18 U.S.C. § 371), 13 counts of mail fraud (18 U.S.C. § 1341), and two counts of money laundering (18 U.S.C. § 1957(a)). The charges against Karin were similar: one count of conspiracy to commit mail fraud, four counts of mail fraud, and one count of money laundering. After an eight-week trial, a jury convicted both of them on all counts. The district court, seemingly taking their advanced age into account (Leon was 78 and Karin 76 at the time), gave both of them below-guidelines sentences: Leon re-ceived a 72-month sentence based on a range of 78 to 97 months; and Karin received a 36-month sentence based on a range of 41 to 51 months.

## II

Both defendants have appealed. Leon presents three arguments for our consideration: (1) the jury instructions violated his Fifth Amendment rights, because they allegedly made acquittal only optional upon a finding of reasonable doubt; (2) the district court abused its discretion under Federal Rule of Evidence 403 when it permitted the admission

of evidence of Leon's marital infidelity; and (3) the sentence imposed on Leon was procedurally and substantively unreasonable. Karin raises two points: (1) the evidence was insufficient to support her convictions; and (2) her sentence was unreasonable because the loss amount overstated the seriousness of her conduct. We address Leon's appeal first, and then turn to Karin's.

## A. Leon Dingle

At the trial, Leon twice submitted proposed instructions to the district court. Consistently with the Seventh Circuit's Pattern Criminal Federal Jury Instructions, he asked the court to give an "elements" instruction that followed this model:

> If you find from your consideration of all the evidence that the government has proved each of these elements [of the offense] beyond a reasonable doubt, then you *should* find the defendant guilty [of that charge].

> If, on the other hand, you find from your consideration of all the evidence that the government has failed to prove any one of these elements beyond a reasonable doubt, then you *should* find the defendant not guilty [of that charge].

7TH CIR. CRIMINAL PATTERN INSTRUCTION 4.01 (Elements/Burden of Proof) (emphasis added). The district judge complied, which puts Leon in the awkward position of attacking the instruction he requested.

Leon rests his complaint about this instruction on the firmly established rule of *In re Winship*, 397 U.S. 358, 364 (1970), that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable

doubt of every fact necessary to constitute the crime with which he is charged." No one disputes that this is the rule, in the abstract. But it is not a rule that can help Leon.

The first problem is that, by affirmatively requesting the use of the pattern language, Leon has waived this argument. This should have been clear, in light of our consistent holdings that "approval of a jury instruction in the district court extinguishes any right to appellate review of the instruction." *United States v. Trudeau*, 812 F.3d 578, 589 (7th Cir. 2015) (quoting *United States v. Yu Tian Li*, 615 F.3d 752, 757 (7th Cir. 2010)).

Even if we could stretch to find forfeiture, rather than outright waiver, Leon would be no better off. This court has twice considered and rejected the argument that the use of the word "should" in the jury instruction, rather than the word "must," impermissibly permits conviction even if the jury concludes that one or more elements has not been proven beyond a reasonable doubt. *United States v. Mansoori*, 304 F.3d 635, 655–56 (7th Cir. 2002); *United States v. Kerley*, 838 F.2d 932, 940 (7th Cir. 1988). As we said in *Kerley*, "it is hardly plausible that the jury supposed that while they 'should' acquit Kerley if he was not guilty beyond a reasonable doubt, they didn't have to acquit him if they didn't want to." 838 F.2d at 940. We recognize, as Leon points out, that most of our sister circuits use the word "must" in their pattern instructions, but that does not mean that "should" is incorrect. For what it is worth, Webster's Third International Dictionary indicates that "should" is used in an auxiliary sense to express "duty, obligation, necessity, propriety, or expediency." This makes it even harder for us to condemn the use of the word "should" as plain error, which is the standard that applies for a forfeited argument. See *Puckett v. United States*, 556 U.S. 129, 134–35 (2009).

Given the strength of the evidence against Leon, we also find it impossible to believe that the substitution of the word "must" for "should" in this instruction could have affected the jury's decision. Taken as a whole, the instructions to the jury properly told it how to apply the reasonable-doubt standard. The district court did not commit error at all, much less reversible error, by accepting the language Leon offered and instructing the jury consistently with this court's long-standing jurisprudence.

Leon's second complaint relates to the district court's decision to admit evidence of his dalliances with Quinshaunta Golden and Claudia Johnson. The government wanted to use this evidence to show Leon's close personal ties with a high-level Department employee who was steering grants to the straw charities (Golden) and with the head of AWARE (Johnson), one of those "charities." An important theme of the government's case was Leon's close ties with his co-conspirators. These explained the structure of the fraudulent scheme, his leadership role, and the trust displayed by the participants. Nothing suggests, furthermore, that the government was obsessed with the sexual nature of these relationships. It also highlighted other ties, such as Leon's longstanding friendship with Hickombottom.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and that fact "is of consequence in determining the action." FED. R. EVID. 401. Relevant evidence is admissible unless the Constitution, a law, or the rules prohibit it. FED. R. EVID. 402. The only possible rule that might have excluded this evidence was Rule 403, which allows a court to keep out otherwise rel-

evant evidence "if its probative value is substantially out-weighed by a danger of … unfair prejudice … ." FED. R. EVID. 403. The district court has considerable leeway in its application of Rule 403, and we are satisfied that it stayed within the bounds of its authority.

Finally, we have Leon's sentencing arguments. His advisory sentencing range, based on an offense level of 28 and a criminal history category of I, was 78 to 97 months. This rested on a loss amount between $1.5 million and $3 million, and several upward adjustments, including one for being the organizer or leader of the scheme. After weighing the factors outlined in 18 U.S.C. § 3553(a), the district court selected a below-guidelines sentence of 72 months, and it ordered Leon to pay $2.9 million in restitution (of which $386,250 was owed jointly and severally with Golden and Jackson). Leon attacks this sentence as procedurally flawed, for allegedly failing to take into account either his age and physical condition or the fact that he already had paid a substantial amount toward his restitution and could pay much more if he were not imprisoned.

If the district court actually had overlooked these two arguments, we might have a problem. See, *e.g.*, *United States v. Donelli*, 747 F.3d 936, 939 (7th Cir. 2014) (judge must address defendant's principal arguments in mitigation if those arguments have recognized legal merit). But the court was guilty of no such oversight. First, in keeping with our recommendation in *United States v. Garcia-Segura*, 717 F.3d 566, 568–69 (7th Cir. 2013), the judge (upon the government's prompting near the end of the proceedings) asked Leon whether he had "adequately addressed all of [the] sentencing arguments," and Leon's attorney said yes. Unless the timing of the question

was a problem—a point on which we would comment only if there were something to his position—that was enough to waive any procedural objection based on the court's failure to discuss something.

Even if Leon's sentencing arguments were not waived or forfeited, they have no merit whatsoever. The court commented that "there's no question that this was a very serious offense … based on greed," that it went on for several years and involved "staggering" amounts of money, and that the evidence was "overwhelming." The court also expressly considered Leon's evidence in mitigation. That included his importance to his family, his lifelong devotion to Chicago's minority community, his ability to pay, his faith, and the character letters in the file. In addition, the court said, "I've considered the defendant's age and his physical condition." It acknowledged that Leon was in his late seventies, and that this was a factor that had to be taken into account. That is just what the court did: on the one hand, it considered the importance of general deterrence and avoiding disparities, and on the other hand, it considered the seriousness of the crime and its view that age alone does not warrant a discounted sentence. In short, although Leon may not like the way in which the court weighed his advanced age, the court did not commit the procedural error of overlooking this point. There was no need for the court to delve into the mortality tables for the demographic group to which Leon belongs, as he argues.

There is also nothing to Leon's complaint about the weight that the court gave to his pre-payment of restitution. He paid about $1 million in restitution before sentencing. The judge knew this, although he said little about it, commenting only that he had considered Leon's "ability to pay restitution by

selling legitimately obtained assets" as a mitigating factor. Even with a million paid off, Leon still owed another $1.9 million in restitution. All told, this point was insubstantial enough that it did not require more than the brief acknowledgement the court gave it.

Leon's only remaining argument is that his sentence was substantively unreasonable. Aside from the fact that we have yet to grant relief to a defendant on the ground that a below-guidelines sentence is substantively unreasonable, nothing in Leon's case prompts us to break that pattern. He stole $4.5 million in public funds that were intended to prevent AIDS, cancer, and other serious diseases in Illinois's needy population. He was thus a reverse-Robin Hood, stealing from the poor to enrich himself and his family. Even though he will be in his mid-80s when he leaves prison, that is not the kind of *de facto* life sentence that has concerned us in the past.

## B.  Karin Dingle

Karin's primary argument on appeal is that the evidence did not show that she intentionally committed the crimes of which she was accused. It is exceedingly difficult to win on this basis, once a jury has weighed the evidence and has found guilt beyond a reasonable doubt. As the Supreme Court put it in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), at this stage of the proceedings "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Recall that Karin was charged with conspiracy to commit mail fraud, several substantive counts of mail fraud, and one count of money laundering. For the conspiracy charge, the

government had to prove: (1) that there was a conspiracy to commit mail fraud, (2) that Karin joined that conspiracy with the intent to further it, and (3) that at least one conspirator committed an overt act in furtherance of the agreement. *United States v. Sims*, 329 F.3d 937, 943 (7th Cir. 2003). For the mail fraud charges, the government had to show: (1) a scheme to defraud, (2) use of the mails, and (3) Karin's participation in the scheme with the intent to defraud. *United States v. McClellan*, 794 F.3d 743, 751–52 (7th Cir. 2015). Lastly, for the money laundering charge, the government had to prove that "the defendant knew the transaction involved criminally derived property that was derived from an unlawful activity, here, [mail] fraud." *United States v. Ajayi*, 808 F.3d 1113, 1119 (7th Cir. 2015).

Karin's focus on intent makes our job relatively easy. A reasonable juror could conclude that Karin intended to further the conspiracy, intended to participate in the scheme to defraud, and intended to launder the money, if she knew what Advance was really up to. This was certainly a jury question, and the jury might have concluded (as Karin urges) that her work at the firm was limited to light and non-substantive administrative tasks, and that she played no part in either obtaining the grants or diverting them to Advance. But that is not the conclusion the jury drew. Instead, it found her lack of knowledge about some details of the arrangements to be outweighed by what she did know.

We already have reviewed the significant ways in which Karin participated in the scheme to fleece the Department, and how she personally benefited from that scheme. She confronted Leon about taking "too much" grant money, she signed over $1.7 million in Advance checks, she used that

money to purchase a Mercedes-Benz, and she personally diverted $15,000 in grant funds to help her son with his mortgage. She expressly agreed with another person not to pay state taxes that were due. And with all that, just to be safe, the court gave the jury both the basic intent instruction and an ostrich instruction.

We are satisfied that, viewing the evidence favorably to the government, a reasonable jury could find that Karin's actions were intentional, and that she otherwise committed the crimes of which she was accused. She is not in the same position as the defendant in *United States v. Price*, 623 F.2d 587 (9th Cir. 1980), overruled on other grounds by *United States v. De Bright*, 730 F.2d 1255 (9th Cir. 1984) (*en banc*). In *Price*, the defendant truly was minimally involved; she worked at her fraudster husband's company for only three months. Karin worked at Advance for decades. And unlike Price, there were specific incidents that revealed Karin's awareness of the broader scheme.

As we noted, the court sentenced Karin to a prison term of 36 months, based on an advisory range of 41 to 51 months (offense level 22, criminal history category I). As with Leon, the offense level was based on a loss of more than $1.5 million and less than $3 million. The court gave her a four-level downward adjustment in offense level to account for her minimal role in the offense. It rejected her request for a sentence of probation, for which she had argued based on her lack of a prior criminal record, her minimal participation, and her age.

Karin urges that the loss amount that the court used in computing the "anchor" guidelines range greatly overstated her culpability. But by granting her the minimal-participant

adjustment provided by U.S.S.G. § 3B1.2(a), the court expressly took account of her lesser role in the offense. Although it had the discretion under section 3553(a) to add to that discount, it arguably did so by dropping below the guidelines range for her sentence. It was under no obligation to do more.

With respect to substantive reasonableness (a point that we conclude Karin did not waive), Karin argues that because she was a passive recipient of the lucre from the fraud, it is unreasonable to hold her accountable for the full amount stolen. The district court was entitled, however, to take into account the fact that she and Leon shared the ill-gotten gains. As the judge put it, Karin had a "direct connection" to the loss because even though she "was not the leader … [she was] certainly part of the scheme." There was nothing unreasonable about the court's conclusion that in the end "there simply has to be" a consequence for her criminal conduct.

### III

Leon and Karin Dingle enjoyed a luxurious lifestyle for many years. They did so at the expense of people whom the Department of Public Health was trying to help. By the time they were caught and convicted, they were older, but that does not mean that they could, or should, not be held responsible for their actions. We find no error in their convictions or sentences, and so we AFFIRM the judgments of the district court.